[No. S040799. May 6, 1999.]

In re MICHAEL ALLEN HAMILTON on Habeas Corpus.

COUNSEL

Samuel C. Palmer III and Katherine L. Hart, under appointments by the Supreme Court, for Petitioner.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, J. Robert Jibson, William G. Prahl and Raymond L. Brosterhous II, Deputy Attorneys General, for Respondent.

OPINION

BAXTER, J.—Petitioner Michael Allen Hamilton is confined at San Quentin under a 1982 death judgment of the Tulare County Superior Court. Petitioner was convicted of the first degree murders (Pen. Code, §§ 187, 189)[1] of his pregnant wife and their unborn child. Under the 1978 death penalty law, one financial-gain and two multiple-murder special circumstances were found true. (§ 190.2, subd. (a)(1), (3).) The jury sentenced petitioner to death. In June 1989, we reversed one of the multiple-murder special circumstances but otherwise affirmed the judgment in full. (*People* v. *Hamilton* (1989) 48 Cal.3d 1142 [259 Cal.Rptr. 701, 774 P.2d 730].)

On July 5, 1994, petitioner filed this petition for habeas corpus, raising numerous issues, including several claims of juror misconduct. We issued an order to show cause (*In re Hochberg* (1970) 2 Cal.3d 870, 873-874, fn. 2 [87 Cal.Rptr. 681, 471 P.2d 1]) limited to certain issues, including whether Juror Geneva Gholston was actually biased or incompetent, and whether she had concealed bias during the jury selection process.

After receiving the return and petitioner's traverse, we dismissed portions of the order to show cause as improvidently issued. The sole questions preserved were whether Juror Gholston committed prejudicial misconduct by failing to disclose, during voir dire, that she had prejudged the case, and whether petitioner's sister attempted to intimidate Gholston during the trial, thus likely impairing Gholston's ability to be fair. We appointed John P. Moran, Judge of the Tulare County Superior Court, as our referee to supervise discovery, hear evidence, and make factual findings on these matters.

The evidentiary hearing was held in November 1997. The referee's report is now on file. The parties have submitted objections to the report and briefs

---

[1] All further unlabeled statutory references are to the Penal Code.

on the merits of the petition. The referee has found in substance that Gholston neither harbored nor concealed bias. We agree that petitioner has failed to demonstrate grounds for relief on habeas corpus. We will therefore discharge the order to show cause.

FACTS

*Homicide and trial*

On the night of November 2, 1981, petitioner's pregnant wife Gwendolyn was killed by close-range shotgun blasts as she sat in the couple's disabled pickup truck, which was parked on an isolated stretch of highway between Porterville and Bakersfield. Gwendolyn's body was discovered when petitioner's parents drove him back to the disabled vehicle from the telephone booth he had used to call them for assistance with the truck's flat tire.

The homicide was front page news at first, but press coverage sharply diminished after a few weeks. The newspaper stories identified petitioner as the prime suspect and reported, among other things, that Gwendolyn was killed in the couple's truck after petitioner went to seek help for a flat tire, that the person petitioner claimed drove him to the telephone booth had not yet been located, that petitioner had a friend buy him a shotgun a few days before the killing, that petitioner and Gwendolyn maintained substantial insurance policies on their lives despite financial difficulties, that petitioner had a girlfriend, and that two other people—petitioner's sister Carolyn and one Gilbert Garay—were implicated in the case.

Petitioner was charged with the murders of Gwendolyn and her fetus. Jury selection began in October 1982. During voir dire, panelist Gholston, who became a member of the jury, responded to questions from court and counsel about her exposure to pretrial publicity and her ability to be fair.

Among other things, the court asked Gholston whether she had "read in the newspaper, seen on TV, heard on the radio, or had any conversations concerning anything regarding this trial." Gholston responded that she had read about the case in the Porterville newspaper and remembered some details. According to Gholston, "[t]he newspaper said" that petitioner had parked the truck on the highway "and pretended to have a flat tire or something," and that "somebody else came by and killed" Gwendolyn while petitioner was absent in search of help. Gholston also recalled that petitioner's "sister popped into the newspaper" in connection with the case, and that "[s]omeone bought the gun," which was later "disassembled and disposed of in some way or the other."

Gholston answered in the negative when asked whether, "from what you read, and what you just briefly recalled, as you told us right now," she had "form[ed] an opinion regarding the guilt or innocence of the defendant." Gholston confirmed her understanding that only the trial evidence was relevant and stated on several occasions that she could think of nothing impairing her ability to be fair.

Though specifically asked about "conversation[s]" regarding the case, Gholston mentioned none. Nor did she describe any other incident that might bear on her impartiality.

At trial, Carolyn and Garay testified, pursuant to plea bargains, as follows: Petitioner hired them to help him murder Gwendolyn. The plan was for petitioner and Gwendolyn to visit his parents in Porterville. On the way back to Bakersfield, petitioner would stop the couple's pickup on a pretext. Garay would then shoot Gwendolyn with a shotgun from a vehicle driven by Carolyn. On two successive evenings, the scene was set, and the two accomplices drove past the stopped pickup as scheduled, but Garay could not bring himself to fire. On the third night, petitioner punctured the pickup's tire in Porterville, then stopped when it went flat on the return to Bakersfield. He left Gwendolyn in the truck and began walking for help. Carolyn and Garay picked him up and drove him to a telephone booth, where he called his parents with a feigned request for aid. Carolyn and Garay then drove him back to the disabled pickup. He loaded the shotgun, approached the pickup, shot Gwendolyn, demanded another shell from Garay, reloaded, walked back to the pickup, and shot the victim again. After the murder, Carolyn and Garay returned petitioner to the telephone booth, where he met his parents.

A signed K-Mart purchase form indicated that on October 31, 1981, two days before the murder, petitioner's girlfriend Brenda Burns bought a single-shot 12-gauge shotgun. Brenda testified that she procured the gun for petitioner, who accompanied her to the store, and that petitioner also bought and kept shells for the weapon. As a prosecution witness, a K-Mart clerk identified Brenda as the purchaser of the shotgun and petitioner as her sole companion.

Carolyn testified that when petitioner asked her to help find someone to kill Gwendolyn, he said he had a girlfriend and wanted to leave his wife but was afraid he would lose his children in a divorce. There was also evidence that in March 1981, despite their modest means, petitioner and Gwendolyn took out large reciprocal life insurance policies and thereafter maintained the policies despite difficulties in meeting the premiums. In her police confession, admitted at trial, Carolyn stated that petitioner had told her he "wanted the [insurance] money."

The prosecution also introduced statements made by petitioner during police interviews. These included petitioner's initial claim that Gwendolyn had been killed while he was hitchhiking to the telephone booth, and his later assertion that she was killed by a Canadian whom he knew but refused to identify.

Defendant sought to show that Garay might be the actual killer. Recanting her former testimony, the K-Mart clerk testified for the defense that the shotgun was purchased not by Brenda, but by Brenda's sister Sharon, who was accompanied by both petitioner and Garay. On rebuttal, Sharon denied being the person who bought the shotgun.[2]

Petitioner was convicted of two counts of first degree murder. Three special circumstances were found true, one of intentional murder for financial gain and two of multiple murder. In the brief penalty trial, the prosecution introduced petitioner's 1974 conviction for grand theft. Through petitioner's mother, the defense presented evidence that he suffered some abuse as a child.

The jury returned a death verdict. We reversed one of the multiple-murder special-circumstance findings as duplicative, but we otherwise affirmed.

*Habeas Corpus Pleadings and Reference*

In July 1994, over 11 years after the death judgment was rendered and more than 5 years after completion of the direct appeal, petitioner filed the instant proceeding, his second petition for habeas corpus in this court.[3] The petition included many attacks on the guilt and penalty judgments, including several claims of juror bias and misconduct supported by recently obtained juror declarations.

One of the declarations was that of Juror Gholston, then 76 years old. Among other things, Gholston's 1994 declaration stated that (1) before trial, Gholston learned petitioner blamed a "Canadian" for Gwendolyn's murder, (2) Gholston and a neighbor agreed this "ridiculous" story showed petitioner himself was guilty, (3) Gholston "prayed" to sit on petitioner's jury after the spirit of her deceased Uncle Frank, a bank robber and killer, exhorted her to atone for his wrongs by "aveng[ing]" petitioner's crimes, and (4) during

---

[2]Victoria Hamilton, another of petitioner's sisters, testified in the prosecution's case-in-chief that she was originally slated to be the actual shooter of Gwendolyn, but that Garay took her place in the scheme after she moved to Texas. Victoria said she assumed, from telephone conversations with Carolyn after Gwendolyn's death, that Garay had pulled the trigger.

[3]A prior petition, filed in March 1989, was summarily denied in April 1989.

trial, Gholston saw the "skinnier" of petitioner's sisters[4] watching her from a car in the alley behind Gholston's home, which prompted Gholston to request increased police patrols. None of these matters had been brought to the attention of court or counsel at petitioner's trial.

The typed 1994 declaration bore the handwritten initials "G.G." on each page. In addition, the declaration contained several handwritten interlineations, each marked with the same handwritten initials.

We ordered the Director of Corrections to show cause why petitioner's conviction and death judgment should not be vacated "on grounds that Juror Geneva Gholston was actually biased and/or incompetent when sworn as a juror, and that she committed prejudicial misconduct by concealing her bias during the jury selection process."[5] In July 1996, respondent filed a return, which attached a new declaration by Gholston.

Among other things, Gholston's 1996 declaration stated as follows: Her prior declaration was obtained by two investigators who presented a business card from the California Appellate Project (CAP)[6] but did not make clear they represented petitioner and left the opposite impression. The CAP investigators neither recorded nor transcribed their interview with Gholston. She never read the declaration before signing it, and never received a copy. Material portions of the 1994 declaration, particularly with regard to Uncle

---

[4]This was apparently a reference to Victoria Hamilton.

[5]The question arose whether the Gholston claim was barred by delay. (See Cal. Supreme Ct. Policies Regarding Cases Arising From Judgments of Death, policy 3, stds. 1-1.2, 1-2; *In re Robbins* (1998) 18 Cal.4th 770, 780-781 [77 Cal.Rptr.2d 153, 959 P.2d 311] (*Robbins*).) Our general practice is to resolve such procedural matters before deciding whether to issue an order to show cause. However, we intended, by our opinion in this case, to clarify the requirements for establishing that a capital habeas corpus claim is timely. In an unusual step, our original order to show cause therefore directed the parties to address whether the claim's timeliness had been established. In response, petitioner's traverse attached a declaration by his original postconviction counsel, Betty Dawson. Dawson's declaration satisfied us that the claim was presented without substantial delay, i.e., within a reasonable time after "triggering facts" first came to light. (See *Robbins, supra*, 18 Cal.4th at pp. 780, 791.) Meantime, the opportunity to explain our timeliness rules had arisen in other cases. (See *Robbins, supra*; *In re Gallego* (1998) 18 Cal.4th 825 [77 Cal.Rptr.2d 132, 959 P.2d 290].) Accordingly, we dismissed the "timeliness" portion of our order to show cause as improvidently issued. At the same time, we denied with prejudice the Attorney General's motion to discover all information bearing on the timeliness of the Gholston claim. The atypical reference to this procedural matter in our original order to show cause was not intended as a departure from our consistent, and necessary, practice of resolving such preliminary issues *solely on the pleadings*, without resort to protracted litigation of "disputed facts."

[6]Under direct contract with this court, CAP provides various consultative and investigative services for counsel appointed to represent condemned prisoners in postconviction proceedings, including capital appeals and related habeas corpus matters.

Frank, were wrong. Gholston only felt Uncle Frank's spirit as a comfort in accepting and performing jury duty. Furthermore, Gholston had answered all voir dire questions honestly, had put aside all pretrial impressions and judged the case on the evidence alone, and had not been affected at trial by her "belie[f]" she saw petitioner's sister in her alley.

The return also included declarations by three other jurors. These persons variously stated that they had also been misled by the CAP investigators, that they were not given copies of their earlier declarations attached to the petition, and that those prior declarations were inaccurate, at least in part.

After receiving the traverse, we concluded that no prima facie case of juror *incompetence* had been stated. We therefore dismissed as improvidently issued that portion of the order to show cause referring to possible incompetence. However, we concluded there were material issues of disputed fact whether Gholston's selection and subsequent service as a juror were marked by misconduct or other irregularity suggesting her improper bias.

We therefore referred the matter for a hearing on these issues and appointed Judge Moran as our referee. We asked Judge Moran to take evidence, then determine the following: (1) whether Gholston, while serving as a juror, had actual bias arising from pretrial knowledge, an encounter with Uncle Frank, or the alleged alley incident; (2) whether Gholston gave any false, incomplete, or misleading answers to voir dire questions bearing on her ability to be fair; (3) if so, whether she did so intentionally; (4) if Gholston was biased, whether she failed, aside from her voir dire examination, to report the facts and circumstances causing the bias; and (5) whether any such failure violated an admonition of the court, or arose from her conscious effort to conceal her bias.[7]

---

[7]Our reference order posed the following questions: "1. Did Juror Geneva Gholston have any actual bias which prevented her from judging the case impartially? If so, what was the nature of the bias, what were the facts and circumstances that produced it, and at what precise time in relation to the jury selection and/or trial proceedings did they occur? In exploring this issue, the Referee shall be limited to considering possible bias from: [¶] (a) Gholston's alleged general pretrial familiarity with the case and opinions formed on the basis thereof (see Exhibit 34 to Petition for Writ of Habeas Corpus, pp. 1-2). [¶] (b) Gholston's alleged encounters with her deceased Uncle Frank (see Exhibit 34 to Petition for Writ of Habeas Corpus, pp. 2-3). [¶] (c) The incident in which Gholston allegedly saw petitioner's sister parked in the alley behind Gholston's house (see Exhibit 34 to Petition for Writ of Habeas Corpus, pp. 4-5). [¶] 2. Did Juror Gholston give answers to any questions, oral or written, which questions bore on her ability to be a fair and impartial juror and which answers, in connection with the specific issues described in numbered paragraph 1, were false, incomplete, or misleading? If so, what were the relevant questions, when, how, and by whom were

*Evidentiary hearing*

The evidentiary hearing took place in November 1997. It included testimony by Gholston, by Scarlet Nerad, one of the CAP investigators who prepared Gholston's 1994 declaration, and by other witnesses. We briefly summarize the pertinent testimony of each witness.

*Geneva Gholston*

In June 1994, Nerad and Sarah Bryer met with Gholston at her Lindsay home over a three-day period. Nerad and Bryer said they were legal investigators, and Bryer presented a CAP business card. Gholston thought their purpose was to close the case, i.e., "carry out the penalty"; she did not realize they were working for petitioner.[8] Considerable time was spent socializing, but on the first day, Nerad and Bryer interviewed Gholston about her jury service. No notes or recordings were made, a fact Gholston mentioned as the interview ended.

The following day, Nerad and Bryer returned with a draft declaration. Gholston was not given a copy to read; instead, Bryer read the declaration to her. Gholston did not recall whether Bryer asked if the declaration was correct, or that Gholston herself interrupted the oral reading to suggest changes or correct errors.

---

they posed, what were the false, incomplete, or misleading answers, and how were such answers false, incomplete, or misleading? [¶] 3. If Juror Gholston gave any such false, incomplete, or misleading answers, . . . were the inaccuracies, or any of them, knowing, willful, and intentional? If so, (a) which inaccuracies were knowing, willful, and intentional, (b) in what respects were they so, and (c) what facts demonstrate that the inaccuracies were knowing, willful, and intentional? [¶] 4. If Juror Gholston was actually biased as described above, and aside from her direct answers to questions as described above, did Juror Gholston, either before or after she was sworn as a juror, otherwise report to the court her bias and/or any facts and circumstances giving rise thereto? If so, what was the content of her report, when and under what circumstances did she make it, and in what respects, if any, was it false, incomplete, or misleading? If she omitted such a report, did she thereby violate any instruction or admonition she had received as either a prospective or a sworn juror? If so, what was this instruction or admonition? [¶] 5. Whether or not any omission by Gholston to make a complete and accurate report as described in numbered paragraph 4 violated any instruction or admonition, was the omission motivated by a knowing, willful, and intentional purpose to conceal her bias? If so, what facts demonstrate this state of mind?"

[8]Gholston confirmed she later told the Attorney General's representative, as reflected in her 1996 declaration, that "[i]n view of the passage of time, I assumed [petitioner] was about to be executed and I believe one of the investigators told me they were working to make sure [petitioner] was guilty." However, Gholston testified that neither Nerad nor Bryer actually made any such representation. Gholston said the two did not identify themselves as working for either side in the case, or if they did say they worked for petitioner, she "sure didn't take it that way" and "didn't grasp it."

Gholston signed "something" in front of the interviewers, but she did not read what she signed, and the 1994 declaration, as attached to the petition for habeas corpus, is not what she signed.[9] The interviewers left her no copy, and she did not personally examine the contents of the declaration until a representative of the Attorney General's office gave her a copy in 1996. The 1994 declaration contains "a lot of stuff . . . I never heard of before." Gholston felt she was "tricked" by the CAP investigators, and that they were trying to "mess [her] up."

With respect to pretrial exposure, Gholston did read articles about the case during 1982 in the Porterville Recorder. Gholston also subscribed to the Fresno Bee and occasionally read the Bakersfield newspaper. In 1982, petitioner's case "was in all the papers and on television," and she "did watch the television news." As stated in the 1994 declaration, Gholston "knew" from her pretrial newspaper reading that petitioner supposedly discovered his wife's body when he returned to their truck after seeking help for a flat tire, that the authorities first thought Gwendolyn had been stabbed but later found out she had been shot, and that someone, probably Garay, had disassembled the alleged murder weapon and thrown it away in the mountains.

Gholston first learned of the case, however, during a conversation with a neighbor. The neighbor said her husband, a paramedic, had heard at work that a "man over in Terra Bella killed his wife and said somebody from Canada had done it." When Gholston heard petitioner's claim about a Canadian, she responded that it was "ridiculous" because "nobody from Canada would do that, or why would they, or something to that effect. And that's all that was said." The neighbor agreed with Gholston's impression. However, contrary to the statement in the 1994 declaration, Gholston's skepticism about a Canadian as Gwendolyn's murderer did not cause her to conclude that petitioner was the killer, and she said nothing to the neighbor about believing petitioner was guilty. The conversation with the neighbor lasted "not more than five minutes."

Later, during selection of the jury, Gholston answered all voir dire questions accurately and completely, without any motive to evade. It "never occurred to [her]" to mention the conversation with the neighbor. Gholston

---

[9]Throughout her testimony, Gholston was questioned closely about whether she had written the initials "G.G." which appeared at the bottom of each page and beside several handwritten interlineations in the 1994 declaration (see text, *ante*, p. 283). Gholston's answers were somewhat conflicting and ambiguous, but they generally constituted denials that she had initialed any pages or approved any interlineations. Subsequently, when confronted with her 1996 declaration, Gholston acknowledged her signature, but again expressed doubt about one or more sets of handwritten initials contained in the document.

told the truth when asked if she could set aside any pretrial feelings and judge the case on the evidence alone. At the time she took the oath, she did not believe petitioner was guilty; she "had no way of knowing that he was or wasn't."

Gholston does have a deceased Uncle Frank, and she told the CAP investigators his life story basically as recounted in the 1994 declaration. Moreover, she did think about Uncle Frank during the trial, at a time before she was asked on voir dire if there was any reason she could not be fair.

However, the 1994 declaration misrepresents this experience. Gholston never literally saw or conversed with Uncle Frank, felt his spirit settle on her, or heard him speak to her, and she did not tell the interviewers otherwise. All she said and meant was that feeling the spirit of Uncle Frank, whom she considers her guardian angel, helped her clear her mind and overcome her reluctance to serve in such a stressful case. Thereafter, as she heard other panelists seek excusal, she realized she had no excuse, and her conscience would not let her proffer one.

Gholston never got the feeling from Uncle Frank that she "should" serve, she never "prayed" to serve, and Uncle Frank never influenced her to serve. The interviewers "messed up" in drafting the declaration to that effect. Nor did she tell the interviewers she had heard from Uncle Frank that she should "avenge" petitioner's crimes. The interviewers "made [that] up." It is also not true, and she never said, that Uncle Frank remained with her throughout the trial and reassured her that giving the death penalty was the right decision. Gholston's later 1996 declaration, attached to the return, is accurate on these points.[10]

In most respects, the 1994 declaration accurately recounted the incident in the alley behind Gholston's home. Gholston was afraid of the Hamilton family, sisters and mother, throughout their attendance at the trial. Gholston and other jurors had expressed such concerns among themselves. Gholston avoided going to the courthouse restroom alone, and jurors tended to band together to walk to the parking lot. As the 1994 declaration stated, Gholston had read detective novels, and she assumed petitioner could arrange to have a juror killed.

The incident in the alley occurred shortly before guilt deliberations began. Gholston had just returned home from a day in court, and she came outside

---

[10]Gholston testified that she carefully reviewed both the 1994 and 1996 declarations before signing the latter, and that the Attorney General interview leading to the later declaration, unlike the earlier conversation with the CAP investigators, was tape-recorded.

to shut an open gate. She observed petitioner's sister and the sister's boyfriend sitting in a car in the alley. They must have seen her in turn, because they sped away immediately. Gholston was "positive" of the pair's identity because she had just seen them at the trial.

Gholston did not report this incident to the court, though she should have done so.[11] However, she did immediately contact her friend, police dispatcher Rosalee Patterson, to request increased patrols. She was "sure" there were increased patrols for some time thereafter, though she did not actually notice them, and she did not recall telling the CAP investigators that patrols were increased. She never told other jurors about the alley incident itself "because we weren't supposed to talk about this," though she may thereafter have repeated to another juror her general fear of petitioner's family.

### Scarlet Nerad

In June 1994, Nerad was working as a CAP investigator. She and a colleague, Bryer, were assigned to interview the jurors in petitioner's case, including Gholston. When the two first met with Gholston, Bryer gave Gholston a CAP business card. The two investigators did not explain what CAP was, but they identified themselves as working on behalf of the attorney who was trying to help petitioner.[12] Nerad believed they made their status clear to all jurors they approached; they did not attempt to trick or mislead Gholston or any other juror.[13]

On the first interview day with Gholston, no notes or recordings were made.[14] However, Nerad and Bryer immediately returned to their hotel and drafted a declaration from memory. They did not attempt to present a biased

---

[11]At this point, Gholston conceded that the trial judge "told us if we had any trouble why they would take care of it" and that "we were supposed to tell him I suppose," but she nonetheless indicated that it "[n]ever occurred to me" to do so. However earlier, when asked why she had not informed the court of her general fears about petitioner's relatives, she indicated she should have, but she "wasn't that informed at that time" and believed she "just had to tough it out on [her] own."

[12]Nerad denied suggesting to Gholston that she and Bryer were "winding up" the case or working to make sure petitioner was guilty, though Nerad said she might have told Gholston they were in the process of winding up *juror interviews.*

[13]On cross-examination, Nerad denied telling Gholston or other jurors that CAP was an "arm of the court" or "funded by the [California Supreme] Court," though she believed Bryer might have told another juror, in response to a specific question, that CAP was "funded by the courts."

[14]Nerad testified she had no specific instructions to avoid notes or recordings, but her *custom was to* omit them, and she followed the same practice in other juror interviews, because people were more comfortable and Nerad had an excellent memory. On cross-examination, Nerad conceded "[a]nother advantage" of not making notes or recordings is that it avoids generating discoverable material.

or slanted version of the facts. A CAP attorney edited the draft by facsimile transmission (fax).

Probably the next day, Nerad and Bryer returned to Gholston's home with the completed draft. As usual, they had printed two copies. They gave one to Gholston and explained that she should follow along as Bryer read the declaration aloud. Nerad and Bryer went over the draft twice with Gholston. During the first reading, Bryer made handwritten interlineations in response to Gholston's specific requests. Then Gholston and Bryer together read over the revised draft, after which Nerad personally witnessed Gholston initial each page and sign the declaration. Similar procedures were followed in other juror interviews. Gholston, like other jurors, received no copy of her signed declaration.

During the first reading, Gholston stopped Bryer at various times to discuss specific points and suggest changes. Gholston personally requested each of the handwritten interlineations, which were inserted by Bryer, then initialed by Gholston. Among others, these interlineations included references to the "skinnier" Hamilton sister, the claim that Gholston noticed increased patrols after calling the police dispatcher, and Gholston's observation that from reading detective novels, she knew it was likely petitioner could arrange for a family member to kill a juror.

During the first reading, the declaration's description of Gholston's pretrial conversation with her neighbor prompted considerable discussion. Gholston expressed concern about including this episode, particularly the fact that the "ridiculous" story about a Canadian had persuaded her petitioner was guilty. Gholston indicated "[s]he knew that was inappropriate and she was concerned about the consequences of admitting that," i.e., that petitioner "might get out."[15] Nonetheless, Gholston acknowledged that the declaration gave an accurate description of the incident, including that the Canadian story had caused her to prejudge petitioner's guilt. Gholston did not ask that the wording be changed.[16]

Gholston spoke at length of Uncle Frank. She explained that this relative, whom she never met alive, had pursued a career of robbing banks and killing

---

[15]According to Nerad, Gholston confirmed that on voir dire she had not mentioned the conversation with the neighbor, but she did not give any reason for failing to do so.

[16]Nerad testified that on the day after the 1994 declaration was initialed and signed, she and Bryer dropped in on Gholston again to advise her, after speaking with a CAP attorney, that it appeared the conversation with the neighbor, leading Gholston to prejudge the case, was "clearly probably misconduct" in which a judge "might well be interested." Gholston responded that she had been bothered by this problem, but would stick by the truth and was "relieved" to be doing so.

tellers because when he was a child, a bank had foreclosed on the family farm. Gholston called Uncle Frank a guardian angel who had helped her throughout life during difficult times. She told of a time when Uncle Frank had "lifted her over some water" or had "helped her get across [some] type of water or stream."

Gholston did say Uncle Frank's spirit "settled on her" during jury selection, and that he actually "talked to her," but this latter information was not literally included in the 1994 declaration. The phraseology actually used represents "the most succinct solid description [Gholston] was able to give," in that she "had a difficulty describing what had happened" because it was "a personal experience that [seemed] difficult for her to verbalize." Though Gholston recounted the experience in several ways, she did end up saying Uncle Frank persuaded her that he had repented his criminal career and that his wrongs needed to be righted. As the 1994 declaration reports, Gholston explicitly stated her understanding from Uncle Frank that "finding [petitioner] guilty" was the way to right these wrongs and that after Uncle Frank appeared to her, she wanted to serve on petitioner's jury. The declaration also accurately reports Gholston's statement that Uncle Frank stayed with her during penalty deliberations, assuring her that the death penalty was the right decision and that "she should do right by his wrongs."

### Richard Barnes

Barnes is a private investigator retained by petitioner's habeas corpus counsel. During a 1997 interview, Gholston told him she subscribed to and read only the Fresno newspaper, never the Porterville newspaper. Barnes also located and interviewed petitioner's sister Victoria, now living in Canada. He was unable to confirm that Victoria was ever in the alley behind Gholston's house. Finally, Barnes located Gholston's former neighbor, Endina Portillo, and confirmed that Portillo and Gholston had conversations. Barnes did not confirm that they had discussed details of petitioner's case prior to trial.

### Ronald Clevenger

Clevenger served on petitioner's jury. Nerad and Bryer came to his home unannounced in the summer of 1994 to ask questions about his jury service. He spoke to them on his front porch for 20 to 30 minutes. They did not identify themselves clearly and gave the impression they represented the government, specifically the court. They said the case was in its "final stages" and their purpose was to make sure there had been a fair trial. Clevenger began asking questions to determine who they were, and he

requested a business card. One of the two handed him a card bearing CAP's name. They volunteered no information about CAP. In response to Clevenger's persistent inquiries, they said it was an agency authorized and funded by the courts to investigate death penalty cases.

During the interview, Nerad and Bryer asked "leading questions . . . that took a lot of thought to answer so that they would not be misinterpreted." These concerned whether Clevenger had been influenced during the trial by publicity about the case. The questions seemed to have no right answer, since a "yes" would indicate bias, while even a "no" would imply that Clevenger had violated the court's admonition to avoid media reports about the trial. Clevenger felt that the interview was not being conducted fairly and that Nerad and Bryer were trying to trick him. He began to realize they represented petitioner and were seeking possible grounds for overturning the jury verdict. He was offended by their unannounced appearance, by their failure to identify themselves clearly at the outset, and by the tenor of their questions. He told them they should be ashamed of themselves and asked them to leave. They did so.

### Lahoma Kuehl

Kuehl served on petitioner's jury. In the summer of 1994 two women, who identified themselves as legal investigators, came to her home to interview her about her jury service. They showed her a business card but did not say they were working on petitioner's behalf. They seemed "official," and Kuehl had the impression they were on "our side," i.e., the side of preserving the jury's verdict. She thought the two women should have told her immediately that they represented petitioner; had they done so, she would not have let them in her house. She felt tricked.

Kuehl was questioned on one day, while one of the women took notes. The women then returned the next day with a written declaration. Kuehl was allowed to read the declaration, and she signed it and initialed each paragraph for accuracy as instructed. However, she was too trusting, and she must not have read carefully or understood fully, because although some portions of her 1994 declaration are true, others are incorrect, slanted, and exaggerated. Contrary to the declaration, she did not become convinced of petitioner's guilt early in the trial, but only after hearing all the evidence. The declaration's insinuation that Kuehl is a religious fanatic is also not true; she did not tell the interviewers she "hand[ed] over her [trial] worries to God" and sought penalty guidance by reading and rereading the Bible's teachings that capital punishment is appropriate. All Kuehl said was that she is a Christian, believes in the death penalty because she finds it supported by

the Bible, reads the Bible daily, and maintained this custom during the trial. Though aware of biblical references to the death penalty, she did not recall reading them during the trial and did not consult the Bible for specific guidance.

Finally, unlike Gholston, Kuehl did not fear going to the courthouse restroom because the Hamilton sisters might be using it. Kuehl was not afraid of petitioner or his family during the trial.

### Allen Peoples

Peoples was a member of petitioner's jury. In 1994, he was contacted by telephone for an appointment to interview him about his jury service. Thereafter, two women came to his home. They indicated they were investigators for the "Appeals Court in San Francisco" and were saving jurors a trip to San Francisco by asking questions the appellate judge would have asked. The investigators gave Peoples a business card but did not disclose they were working for petitioner's defense. Peoples told them he was reluctant to say anything that might compromise the verdict. They assured him that was not their purpose, and "[t]here was no way that would happen." Peoples would not have spoken to them had he known they represented petitioner. He felt they did not deal with him honestly.

The investigators interviewed him on one day, taking notes. Among other things, they asked about whether he had violated jury admonitions, including the warning to avoid media reports. On the second day, as arranged, they returned with a typed draft declaration. He was permitted to read the draft himself. Changes he requested were made by handwritten interlineation, after which he signed the declaration and initialed each paragraph, as instructed, to verify its accuracy. He considered even the final version "embellished" to some degree, and not entirely correct, but he signed it anyway in the belief that any inaccuracies were immaterial. As indicated in his 1996 declaration obtained by the Attorney General, the only clear error in his 1994 declaration, one he overlooked when signing and initialing that document, was that his jury service in a child molestation case occurred after, not before, he served on petitioner's jury.

### Rosalee Patterson

In 1982, Patterson was both a regular dispatcher for the Lindsay Police Department and the department's records supervisor. Then, as in 1997, she was acquainted with Gholston but not a close friend. Patterson did not recall receiving a call from Gholston reporting that Gholston was a juror in a

capital case and was frightened because a relative of the defendant was lurking outside her home. Patterson would remember such an incident. Had such a call been received by any dispatcher, an officer would have been sent to Gholston's residence, a police report generated, and extra patrols ordered. A police report from 1982 would have been purged from the records by the time of Patterson's testimony in 1997. However, even if Patterson was not the dispatcher who took Gholston's call in 1982, Patterson would have seen and remembered the police report in her 1982 capacity as records supervisor. She did not recall such a report.

### Betty Dawson

Dawson represented petitioner on appeal and in other postconviction matters from 1983 through 1990. As she stated in her 1996 declaration attached to petitioner's traverse, her notes indicate that in 1989, she contacted jurors, including Gholston, to determine whether there were issues of juror misconduct to raise on habeas corpus. According to Dawson's records, her brief inquiries uncovered no facts such as those represented in Gholston's 1994 declaration, and no potentially meritorious misconduct claims.

### Michael Stanford

Stanford is an investigator for the Attorney General's office. He witnessed the circumstances under which Gholston's 1996 declaration attached to the return was prepared and executed. Gholston was interviewed on one day, then asked to approve a draft declaration the next. As the draft was read to her, Gholston requested minor changes, which were made by hand. She initialed the changes, then signed the document.

### Referee's Findings

The referee's report, and the parties' objections thereto, are on file. In substance, the referee has found that (1) petitioner has failed to show by a preponderance of evidence that Gholston either harbored or concealed pretrial bias, (2) any inaccurate responses by Gholston on voir dire were inadvertent, not deliberate, and (3) if Gholston saw petitioner's sister in the alley behind Gholston's home during the trial, the experience did not cause Gholston to prejudge petitioner's case. The referee further determined that these findings made it unnecessary to address other questions included in our reference order. The referee's findings are discussed in greater detail in individual sections below.

### DISCUSSION

An accused has a constitutional right to a trial by an impartial jury. (U.S. Const., amends. VI and XIV; Cal. Const., art. I, § 16; *Irvin* v. *Dowd*

(1961) 366 U.S. 717, 722 [81 S.Ct. 1639, 1642, 6 L.Ed.2d 751] (*Irvin*); *In re Hitchings* (1993) 6 Cal.4th 97, 110 [24 Cal.Rptr.2d 74, 860 P.2d 466] (*Hitchings*); see *Weathers* v. *Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 110 [95 Cal.Rptr. 516, 485 P.2d 1132] (*Weathers*).) An impartial jury is one in which no member has been improperly influenced (*People* v. *Nesler* (1997) 16 Cal.4th 561, 578 [66 Cal.Rptr.2d 454, 941 P.2d 87] (*Nesler*); *People* v. *Holloway* (1990) 50 Cal.3d 1098, 1112 [269 Cal.Rptr. 530, 790 P.2d 1327] (*Holloway*)) and every member is " 'capable and willing to decide the case solely on the evidence before it' " (*McDonough Power Equipment, Inc.* v. *Greenwood* (1984) 464 U.S. 548, 554 [104 S.Ct. 845, 849, 78 L.Ed.2d 663] (*McDonough*), quoting *Smith* v. *Phillips* (1982) 455 U.S. 209, 217 [102 S.Ct. 940, 946, 71 L.Ed.2d 78] (*Smith*)).

■ However, with narrow exceptions, evidence that the internal thought processes of one or more jurors were biased is not admissible to impeach a verdict. The jury's impartiality may be challenged by evidence of "*statements* made, or conduct, conditions, or *events* occurring, either within or without the jury room, of such a character as is *likely* to have influenced the verdict improperly," but "[n]o evidence is admissible to show the [*actual*] *effect* of such statement, conduct, condition, or event upon a juror . . . or concerning the *mental processes* by which [the verdict] was determined." (Evid. Code, § 1150, subd. (a), italics added; see *People* v. *Hutchinson* (1969) 71 Cal.2d 342, 349-350 [78 Cal.Rptr. 196, 455 P.2d 132] (*Hutchinson*).) Thus, where a verdict is attacked for juror taint, the focus is on whether there is any *overt* event or circumstance, "open to [corroboration by] sight, hearing, and the other senses" (*Hutchinson, supra*, 71 Cal.2d at p. 350), which suggests a *likelihood* that one or more members of the jury were influenced by improper bias.[17]

When the overt event is a direct violation of the oaths, duties, and admonitions imposed on actual or prospective jurors, such as when a juror conceals bias on voir dire, consciously receives outside information, discusses the case with nonjurors, or shares improper information with other jurors, the event is called juror misconduct. (See, e.g., *Nesler, supra*, 16 Cal.4th 561, 578-579; *In re Carpenter* (1995) 9 Cal.4th 634, 647 [38 Cal.Rptr.2d 665, 889 P.2d 985] (*Carpenter*); *Hitchings, supra*, 6 Cal. 4th 97, 118.) A sitting juror's involuntary exposure to events outside the trial

[17]This rule "serves a number of important policy goals: It excludes unreliable proof of jurors' thought processes and thereby preserves the stability of verdicts. It deters the harassment of jurors by losing counsel eager to discover defects in the jurors' attentive and deliberative mental processes. It reduces the risk of postverdict jury tampering. Finally, it assures the privacy of jury deliberations by foreclosing intrusive inquiry into the sanctity of jurors' thought processes." (*Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 414 [185 Cal.Rptr. 654, 650 P.2d 1171], fn. omitted (*Hasson*).)

evidence, even if not "misconduct" in the pejorative sense, may require similar examination for probable prejudice. Such situations may include attempts by nonjurors to tamper with the jury, as by bribery or intimidation. (See, e.g., *Remmer* v. *United States* (1954) 347 U.S. 227, 229 [74 S.Ct. 450, 451, 98 L.Ed. 654]; *People* v. *Cobb* (1955) 45 Cal.2d 158, 161 [287 P.2d 752] (*Cobb*); *People* v. *Federico* (1981) 127 Cal.App.3d 20, 38-39 [179 Cal.Rptr. 315] (*Federico*).)

■ The jurors' *pretrial* exposure to publicity about the case is not itself grounds to impeach the verdict, even when the exposure led them to develop tentative opinions about the defendant's guilt or innocence. "In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. [Citations.]" (*Irvin, supra*, 366 U.S. 717, 722-723 [81 S.Ct. 1639, 1642-1643].)

However, during jury selection the parties have the right to challenge and excuse candidates who clearly or potentially cannot be fair. Voir dire is the crucial means for discovery of actual or potential juror bias. Voir dire cannot serve this purpose if prospective jurors do not answer questions truthfully. "A juror who conceals relevant facts or gives false answers during the voir dire examination thus undermines the jury selection process and commits misconduct. [Citations.]" (*Hitchings, supra*, 6 Cal.4th 97, 111; see *McDonough, supra*, 464 U.S. 548, 554 [104 S.Ct. 845, 849].)

■ Misconduct by a juror, or a nonjuror's tampering contact or communication with a sitting juror, usually raises a rebuttable "presumption" of prejudice. (E.g., *Nesler, supra*, 16 Cal.4th 561, 578; *Carpenter, supra*, 9 Cal.4th 634, 651-652; *People* v. *Marshall* (1990) 50 Cal.3d 907, 950 [269 Cal.Rptr. 269, 790 P.2d 676] (*Marshall*); *Federico, supra*, 127 Cal.App.3d 20, 38.) This presumption aids parties who are barred by statute from establishing the actual prejudicial effect of the incident under scrutiny (e.g., *Carpenter, supra*, 9 Cal.4th 634, 651-652; *Holloway, supra*, 50 Cal.3d 1098, 1108-1109) and accommodates the fact that the external circumstances of the incident are often themselves reliable indicators of underlying bias (see, e.g., *Hitchings, supra*, 6 Cal.4th 97, 119-120).

Still, whether an individual verdict must be overturned for jury misconduct or irregularity " ' "is resolved by reference to the substantial likelihood test, an objective standard." ' " (*Hitchings, supra*, 6 Cal.4th 97, 118, quoting *Marshall, supra*, 50 Cal.3d 907, 950-951, quoting 2 ABA Standards for Criminal Justice, com. to std. 8-3.7 (2d ed. 1980) p. 8.58.) Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant. (E.g., *Carpenter, supra*, 9 Cal.4th 634, 653; *Hitchings, supra*, 6 Cal.4th 97, 121.)

The standard is a pragmatic one, mindful of the "day-to-day realities of courtroom life" (*Rushen* v. *Spain* (1983) 464 U.S. 114, 119 [104 S.Ct. 453, 456, 78 L.Ed.2d 267]) and of society's strong competing interest in the stability of criminal verdicts (*id.* at pp. 118-119 [104 S.Ct. at pp. 455-456]; *Carpenter, supra*, 9 Cal.4th 634, 655). It is "virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." (*Smith, supra*, 455 U.S. 209, 217 [102 S.Ct. 940, 946].) Moreover, the jury is a "fundamentally human" institution; the unavoidable fact that jurors bring diverse backgrounds, philosophies, and personalities into the jury room is both the strength and the weakness of the institution. (*Marshall, supra*, 50 Cal.3d 907, 950.) "[T]he criminal justice system must not be rendered impotent in quest of an ever-elusive perfection. . . . [Jurors] are imbued with human frailties as well as virtues. If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias." (*Carpenter, supra*, 9 Cal.4th at pp. 654-655.)

■ When issues of juror misconduct or taint arise in a petition for habeas corpus before this court and become the subject of an evidentiary hearing before our referee, our review of the referee's report follows well-settled principles. The referee's factual findings are not binding on us, and we can depart from them upon independent examination of the record even when the evidence is conflicting. (*Hitchings, supra*, 6 Cal.4th 97, 109; *People* v. *Ledesma* (1987) 43 Cal.3d 171, 219 [233 Cal.Rptr. 404, 729 P.2d 839].) However, such findings are entitled to great weight where supported by substantial evidence. (*In re Malone* (1996) 12 Cal.4th 935, 946 [50 Cal.Rptr.2d 281, 911 P.2d 468] (*Malone*); *In re Ross* (1995) 10 Cal.4th 184, 201 [40 Cal.Rptr.2d 544, 892 P.2d 1287] (*Ross*).) Deference to the referee is particularly appropriate on issues requiring resolution of testimonial conflicts and assessment of witnesses' credibility, because the referee has the opportunity to observe the witnesses' demeanor and manner of testifying.

(*Malone, supra*, 12 Cal.4th at p. 946; *Ross, supra*, 10 Cal.4th at p. 201.)[18] On the other hand, any conclusions of law or resolution of mixed questions of fact and law that the referee provides are subject to our independent review. (*Hitchings, supra*, 6 Cal.4th 97, 109.)

*Relevance and authenticity of 1994 Gholston declaration*

As indicated above, Gholston's 1996 declaration, and her live testimony, contradicted her 1994 declaration in material respects. On the witness stand, Gholston went so far as to deny that the 1994 declaration was authentic. At the hearing, petitioner's counsel faced the task of showing that Gholston's 1994 declaration, suggesting her actual bias, was more credible than her later disclaimers. Counsel thus devoted considerable attention to impeaching Gholston's claims that she never read, approved, initialed, or signed the earlier document. The Attorney General presented substantial rebuttal evidence on that issue.

We did not ask the referee to determine whether Gholston's 1994 declaration was authentic, and he did not do so. Indeed, he neither identified nor resolved any specific credibility disputes. Instead, he appears to have concluded that even if Gholston did review and approve the 1994 declaration attributed to her, its words are subject to interpretation in light of the evidence introduced at the reference hearing. Our analysis proceeds accordingly.

*Concealment of bias; pretrial exposure*

 Gholston was asked on voir dire to disclose everything she had read, seen, heard, or said about petitioner's case, and whether any such exposure caused her to form an opinion of petitioner's guilt or innocence. In response, Gholston recounted a number of crime details she had learned from the Porterville newspaper, but she did not mention any other pretrial exposure. Gholston insisted on voir dire that she was not biased and would decide the case on the evidence.

Gholston's 1994 declaration stated for the first time that sometime before trial, a neighbor had told her about petitioner's claim of a Canadian killer. The 1994 declaration said that this "ridiculous" story convinced Gholston

---

[18]Moreover, the referee is entitled to discredit portions of a witness's testimony while finding the witness credible in other particulars. (E.g., *Hitchings, supra*, 6 Cal.4th 97, 114.) Thus, the fact that the referee expressly or impliedly disbelieved a witness in some respects, or that portions of a witness's testimony seem unlikely on their face, does not mean that any finding based solely or primarily on the same witness's testimony on other matters is without substantial support.

petitioner was guilty. However, in her 1996 declaration, Gholston insisted that her pretrial exposure did not cause her to prejudge the case.

At the reference hearing, Gholston disclosed that before petitioner's trial, she read newspapers other than the Porterville Recorder and also saw pretrial television coverage about the homicide. She confirmed the pretrial conversation about petitioner's "Canadian" claim. However, Gholston insisted that her skepticism about a Canadian killer did not cause her to prejudge petitioner's guilt, and she said it had "never occurred to [her]" to mention this conversation during voir dire examination. CAP investigator Nerad, who helped draft the 1994 declaration, testified that it accurately conveyed Gholston's statements about the prejudicial effect of the "Canadian" conversation.

On this issue, the referee found as follows: Prior to trial, Gholston was generally familiar with the case from newspaper and television accounts. The conversation with the neighbor "occurred a year prior to her jury service and any superficial opinion arising from that conversation was probably forgotten." Gholston's failure to describe either the full extent of her exposure to pretrial publicity or her conversation with the neighbor made her voir dire answers incomplete, but the omissions were inadvertent, not willful. The failure to mention television reports was an "obvious oversight," and the trial court did not give Gholston a full opportunity to recount the extent of her newspaper reading. Gholston's claim that it never occurred to her to mention the conversation with the neighbor "[is] interpret[ed] [by the referee] to mean [that] at the time she was being examined, a year after the conversation, she simply did not recall it under the stress of the moment." Gholston's testimony that when sworn as a juror she did not believe petitioner to be guilty, and that she set aside all pretrial feelings and decided the case on the evidence, is true.

The referee's findings appear sound insofar as they inform our determination that relief on this issue is not warranted. ▇▇▇ ▬▬ Substantial evidence supports the referee's determination, and we independently agree, that even if Gholston's voir dire answers understated her pretrial awareness and impressions about the case, particularly with respect to petitioner's claim of a Canadian killer, her omissions did not lead to the seating of a biased juror.[19]

▇▇▇ Crucially, the referee found that Gholston's omissions on voir dire were *inadvertent*, not intentional. Ample evidence supports that finding, and

---

[19]The Attorney General urges that the rule against impeaching a verdict with evidence of jurors' subjective "mental processes" (Evid. Code, § 1150) renders incompetent and irrelevant any evidence that Gholston was *actually biased* as the result of pretrial events, including her exposure to pretrial information about the case. However, the rule against proof of juror

we adopt it. No evidence was introduced to indicate that when questioned on voir dire, Gholston deliberately concealed aspects of her pretrial knowledge and views about the case, including, in particular, her conversation with her neighbor.

Indeed, all inferences are to the contrary. In response to voir dire inquiries, Gholston did reveal substantial details about her pretrial exposure, including her recollection that petitioner "pretended" to have a flat tire and claimed "somebody else" killed Gwendolyn while he was away from their disabled truck. Gholston's voir dire answers thus suggest a good faith effort to remember and disclose such information. Gholston has since acknowledged at all stages that the conversation with the neighbor did take place, a further indication that she never intended to hide it. Gholston insisted at the reference hearing that it simply "never occurred to [her]" to mention this brief incident during voir dire. Having observed Gholston's demeanor as a witness, the referee interpreted this to mean that the conversation, which apparently occurred well before trial, simply slipped Gholston's memory under the stress of voir dire examination.[20] CAP investigator Nerad, who interviewed Gholston in 1994, testified at the reference hearing that while Gholston admitted her failure to disclose the matter during voir dire, she never suggested the omission was purposeful.

Thus, the facts of this case contrast starkly with those of *Hitchings, supra,* 6 Cal.4th 97, where we adopted a referee's finding of intentional concealment. In *Hitchings,* the juror never conceded she had given incorrect voir dire answers about her pretrial knowledge. (*Id.* at p. 116.) Instead, after stating in her jury questionnaire that she had *no* prior knowledge of the case at issue, the *Hitchings* juror continued, at the habeas corpus reference hearing, to profess her complete pretrial ignorance, despite credible testimony from others that she had at least overheard several pretrial conversations about the case. (*Id.* at pp. 115-116.) Under the very different circumstances present here, we are satisfied that Gholston committed no intentional concealment.

mental processes is subject to the well-established exception for claims that a juror's preexisting bias was concealed on voir dire. (See, e.g., *Hutchinson, supra,* 71 Cal.2d 342, 348; *People* v. *Castaldia* (1959) 51 Cal.2d 569, 571-572 [335 P.2d 104]; *People* v. *Hord* (1993) 15 Cal.App.4th 711, 724 [19 Cal.Rptr.2d 55].)

[20]Petitioner attacks the referee's finding that Gholston's conversation with her neighbor occurred a full year before she was selected as a juror. Gholston never stated precisely when the conversation took place. However, jury selection began more than 11 months after Gwendolyn was killed. Moreover, it appears that Gholston's conversation with the neighbor, which she described as lasting no more than five minutes, happened *substantially prior* to her jury summons, and quite soon after the homicide. Pretrial newspaper coverage of the case was substantially greater in the first weeks after the killing. While Gholston admitted she read newspaper accounts, she indicated the conversation with the neighbor was her first inkling of the case, and her account of the conversation suggests that Gwendolyn's murder was then fresh news. Hence, the referee's finding appears essentially accurate.

There is serious question whether *honest* voir dire mistakes can ever form the basis for impeachment of a verdict. (See *McDonough, supra,* 464 U.S. 548, 556 [104 S.Ct. 845, 850] (opn. of Rehnquist, J.); *Hitchings, supra,* 6 Cal.4th 97, 115; see also *Weathers, supra,* 5 Cal.3d 98, 110, fn. 5.) In *McDonough,* a plurality concluded that "[t]o invalidate the result of a [lengthy] trial because of a juror's mistaken, though honest, response to a question, is to insist on something closer to perfection than our judicial system can be expected to give." (*McDonough, supra,* 464 U.S. at p. 555 [104 S.Ct. at pp. 849-850] (opn. of Rehnquist, J.).)

What is clear is that an honest mistake on voir dire cannot disturb a judgment in the absence of proof that the juror's wrong or incomplete answer hid the juror's actual bias. Moreover, the juror's good faith when answering voir dire questions is the most significant indicator that there was no bias. (*McDonough, supra,* 464 U.S. 548, 556-557 [104 S.Ct. 845, 850] (conc. opn. of Blackmun, J.); *id.* at pp. 557-558 [104 S.Ct. at p. 851] (conc. opn. of Brennan, J.).)

Here the referee has found, on substantial evidence, that Gholston's voir dire answers were honest. Moreover, the other evidence is equally consistent with the referee's finding that when sworn as a juror, Gholston harbored no bias as a result of her pretrial exposure.

We first note that an inference of trial bias does not necessarily arise even from Gholston's 1994 declaration itself. The declaration does state that Gholston and her neighbor agreed petitioner's "ridiculous" story about a Canadian showed petitioner was guilty, though Gholston has since insisted that her skepticism about the "Canadian" story never amounted to a prejudgment of guilt. But even if the 1994 declaration is accepted at face value, it does not say Gholston *retained* her opinion about guilt at the time she was selected to serve on petitioner's jury. At the reference hearing, CAP investigator Nerad insisted that the 1994 declaration accurately conveyed Gholston's disclosure she had prejudged petitioner's guilt as a result of the conversation with the neighbor. But even Nerad did not say Gholston had admitted she *remained* so persuaded, and was thus unable to consider the trial evidence fairly, when sworn as a juror.

The evidence suggests, as the referee found, that any preliminary impression Gholston formed from this conversation was insignificant over time and had long since dissipated. As noted above, the conversation was brief, and it apparently occurred well before trial. The conversation constituted only one segment of the substantial amount of pretrial information Gholston had accumulated about the case, most of which she derived from media coverage. Gholston disclosed on voir dire the bulk of the pretrial news she had

learned, including her understanding that petitioner blamed his wife's murder on "somebody" who approached their disabled truck in his absence. After observing Gholston on the stand, the referee found that her voir dire omissions, and her failure to mention the "Canadian" conversation in particular, stemmed from mere forgetfulness.

Gholston stated on voir dire that she was impartial, and that *regardless of any pretrial impressions*, she could and would judge the case solely on the evidence. She has since insisted at all stages that her exposure to pretrial information did not affect her fairness at trial. After watching Gholston testify, the referee explicitly credited Gholston's claim of impartiality, and the circumstantial evidence does not rebut it. Accordingly, we find no basis to conclude that Gholston's failure to disclose fully her pretrial knowledge and opinions about petitioner's case resulted in the seating of a biased juror. ██ ██ ██ It follows that petitioner has demonstrated no grounds for relief on habeas corpus.[21]

*Concealed bias; alleged encounter with Uncle Frank*

██ Gholston's 1994 declaration stated that she was reluctant to serve on the jury, but that one day during jury selection, the "spirit" of her deceased Uncle Frank "settle[d] on [her]," and she "heard" from him that she should serve on the jury to "avenge [petitioner's] crimes," after which she "prayed" to serve. The 1994 declaration further averred that the spirit of Gholston's uncle remained with her throughout the trial and assured her that giving petitioner the death penalty was the correct way to atone for the uncle's crimes of bank robbery and murder.

---

[21]The petition also included a claim that Gholston committed misconduct when, contrary to admonition, she followed news articles about the case *during the trial.* This claim stemmed from the 1994 declaration's statement that Gholston read, clipped, and saved the "attached" articles "as they appeared"; these "attached" clippings bore handwritten midtrial dates and reported trial events. Neither our order to show cause nor our reference order mentioned this issue, but it was addressed at length both in Gholston's 1996 declaration and at the hearing. On both occasions, Gholston insisted her husband clipped the articles and gave them to her only after the trial was over.

The referee made no findings on the subject, and it remains beyond the scope of our prior orders. But even if misconduct occurred, any presumption of prejudice is rebutted. The news clippings contained mere neutral and evenhanded accounts of the trial. They reported no material information not presented in the trial itself. Hence, they were not "inherently" biasing. (*Carpenter, supra,* 9 Cal.4th 634, 653, 655.) Nor do the circumstances suggest Gholston's "actual" bias. (*Id.* at pp. 654, 656.) No strong inference of bias arises simply because a juror failed to resist the temptation to read news articles about events in which one is a direct participant. There is no evidence that Gholston discussed these articles with other jurors or otherwise employed them in her deliberations. (Cf. *Nesler, supra,* 16 Cal.4th 561, 587; *Carpenter, supra,* at p. 656.) Finally, the very strong trial evidence of petitioner's brutal crimes minimizes the concern that any extraneous information in the articles was a significant influence on Gholston's guilt or penalty deliberations. (*Carpenter, supra,* at p. 654.)

In her 1996 declaration, and at the reference hearing, Gholston disclaimed this description of her experience with Uncle Frank as inaccurate and misleading. Gholston insisted she had no literal communication with her deceased uncle, but only felt his spirit as a calming influence that helped her realize she had no legitimate reasons to avoid jury duty. Gholston denied her Uncle Frank urged or influenced her to "avenge" petitioner's crimes or to sentence petitioner to death. At the reference hearing, CAP investigator Nerad insisted the 1994 declaration accurately conveyed what Gholston had said during her interview. On the other hand, Nerad acknowledged that Gholston had difficulty describing the experience because it was personal and difficult to express.

The referee found Gholston had experienced no direct encounter with her Uncle Frank's spirit. In the referee's view, the fact that Gholston felt the uncle's presence, and was thereby reassured to serve and to render her verdicts, did not cause her to prejudge the case.

If sound, the referee's findings establish that Gholston's contemplation of her deceased uncle was not a pretrial event, perception, conversation, or opinion bearing on her ability to be fair as a juror in petitioner's case. In that circumstance, Gholston had no obligation to disclose this matter in response to voir dire questioning, and her failure to do so did not result in the seating of a biased juror.

We conclude the referee's findings on this subject are well founded. As noted above, the referee did not resolve the sharp dispute between witnesses Gholston and Nerad about whether Gholston reviewed and approved each statement finally contained in Gholston's 1994 declaration, including those pertaining to Uncle Frank. Even so, the referee, having observed Gholston on the witness stand, determined that the 1994 declaration's extreme statements on this subject do not accurately convey the experience Gholston was trying to describe. For multiple reasons, we agree.

Gholston has maintained at all relevant times that the 1994 declaration far overstated what she meant to tell the CAP investigators about her deceased uncle. Other circumstances buttress her claim. The incident was highly subjective and inherently difficult to recount; as Nerad herself acknowledged, Gholston had difficulty putting it into precise words. Both Gholston and Nerad agreed the CAP investigators did not record the original interview in which the "Uncle Frank" matter came to light. Nerad confirmed that the initial written draft of this experience was composed solely from the investigators' memory. Particularly where nuance was critical, this procedure exacerbated the chance of error.

Nerad insisted Gholston later had a full opportunity to review and amend the initial draft. But that does not prove the 1994 declaration accurately recorded the "Uncle Frank" experience. As noted above, this experience was difficult to state clearly. Moreover, the conditions under which the declaration was prepared and executed must have been stressful and intimidating. Gholston, then 76 years old, found herself under sudden examination by trained investigators, more than 11 years after the fact, about her possible misconduct on a capital jury. Gholston described the investigators as sociable and ingratiating, but the evidence indicates she was uncertain about whom they represented and unclear about the consequences of any information she gave.[22]

Under such distracting circumstances, any approval Gholston gave to the final draft is no guarantee of its literal accuracy. Two other jurors testified that although they reviewed their similar declarations before signing them, they overlooked or misunderstood passages they later found inaccurate.

Finally, the CAP investigators had an interest in giving Gholston's imprecise description of the "Uncle Frank" episode its most extreme interpretation. There is evidence both Gholston and other jurors felt misled by the interviewing techniques the investigators employed. ▮▮▮ Other jurors also testified, on reflection, that the investigators had drafted their declarations in slanted and exaggerated ways.[23]

---

[22]According to Nerad, Gholston told the investigators she was worried about disclosing her conversation concerning the "Canadian" killer. On the other hand, the evidence suggests she did not realize the potential significance of her "Uncle Frank" story. When asked by petitioner's counsel why she brought up Uncle Frank during the interview, Gholston replied, "We were just talking about relatives and things and we had—my kin folks and I had been working on the family tree and what happened and things like that. And I just told them. I don't know why."

[23]The evidence of sharp practices by the CAP investigators, though vigorously disputed, is cause for concern. We need not determine whether the investigators used dishonest tactics, including misrepresentations about the party (petitioner) or entity (CAP) they represented, to obtain information from Gholston and other jurors. We note, however, that strong public policies protect discharged jurors from improperly intrusive conduct in all cases, and that jurors in criminal cases, in particular, have "an absolute right" not to discuss their verdict or deliberations with anyone. (Code Civ. Proc., § 206, subds. (a)-(d) [criminal jurors have absolute right to refuse posttrial discussion of verdict or deliberations; unconsented or unreasonable juror contacts are prohibited]; also cf. *id.*, § 237, subds. (a)(2), (4), (b) [sealing juror-identifying information, except upon good cause, where verdict rendered after January 1, 1996]; *Hasson, supra,* 32 Cal.3d 388, 414 [civil case; explaining policies against posttrial jury tampering, harassment of jurors, and intrusions into sanctity of deliberative process].) The significant protection afforded jurors in this regard implies the right not to be misled in making the decision whether or not to discuss such matters, particularly by attorneys and those they supervise. (See Bus. & Prof. Code, § 6068, subd. (d) [attorney must employ "such means only as are consistent with truth"].) As petitioner's counsel conceded at oral argument,

 Under all these circumstances, the evidence provides no convincing reason to credit Gholston's 1994 declaration, so lurid as to raise doubts on its face, over her subsequent and more reasonable disclaimers both in writing and on the witness stand. Like the referee, we accept Gholston's assurance that the 1994 declaration does not accurately set forth the "Uncle Frank" episode, and that the true experience is one which could have no bearing on her fairness as a juror. Accordingly, no basis for relief on habeas corpus has been established.

### Incident in alley behind Gholston's home

 As indicated above, Gholston's 1994 declaration stated, and she confirmed at the reference hearing, that once during the guilt phase of petitioner's trial, Gholston saw petitioner's sister and the sister's boyfriend parked in an alley behind Gholston's home, that the two sped away when they saw Gholston, and that Gholston did not report the incident to the court but did telephone her friend Patterson, a police dispatcher, to request increased patrols near her residence. No independent corroboration of the alley incident was introduced at the hearing. Patterson testified she recalled no such report from Gholston and would remember or know if it occurred. The referee found from this evidence that it is "doubtful" Gholston saw petitioner's sister in the alley behind her residence, but even if she did, the incident did not affect Gholston's guilt or penalty determination. Again, we agree.[24]

Petitioner urges that whether Gholston's belief she saw petitioner's sister lurking in her alley was correct or mistaken, Gholston committed misconduct by failing to report this perceived "outside contact" to the trial court. In any event, petitioner suggests, the evidence indicates that the incident, whether real or imagined, played upon Gholston's self-acknowledged fear of petitioner and his family, and thus caused or exacerbated Gholston's actual bias against petitioner.

---

fairness thus suggests, at a minimum, that when attempting to contact discharged criminal jurors, attorneys acting on behalf of any party, and their supervised investigators, should immediately and clearly identify the specific party they represent. Because many such contacts, particularly in capital cases, occur years after the jury was discharged, a juror should also be reminded at the outset of the statutory right to refuse an interview.

[24]The exact nature of the referee's doubt on this matter is not clear. The referee did not specify whether he believed Gholston's claim of such an experience was a lie (as might be inferred from Patterson's failure to corroborate Gholston's claim that Gholston called the police to report the incident), or whether he suspected that Gholston, though sincere, simply imagined the incident or misidentified the occupants of the vehicle she saw in the alley (as might be inferred from the absence of independent evidence that the sister was ever at that location). In his posthearing brief and objections, petitioner does not suggest Gholston lied about the alley incident. Instead, petitioner argues on the assumption that Gholston's testimony was either true or honestly mistaken, i.e., that Gholston either saw or thought she saw petitioner's sister in the alley. We analyze the issue accordingly.

At the outset, we question whether a convicted person can ever overturn the verdict on grounds that persons *acting in his behalf* deliberately sought to influence the jury. Certainly no such claim could ever be valid where the *accused himself* had instigated the incident; a party cannot profit by his or her own wrongdoing. But even where, as here, there is no evidence petitioner was directly involved, recognition of such a claim suggests tempting opportunities for accuseds' allies to manufacture challenges against subsequent convictions.[25]

We need not resolve that issue, however. For several other reasons, we conclude that the incident in Gholston's alley affords petitioner no basis for relief.

In the first place, there is no evidence Gholston's failure to tell the trial court of her experience was misconduct. A sitting juror commits misconduct by violating her oath, or by failing to follow the instructions and admonitions given by the trial court. A lay juror cannot be expected to conform to standards of behavior of which she has not been informed, or to make unguided personal judgments about what the court needs to know. Her failure to do so cannot place at risk a presumptively valid verdict.

Petitioner insists the court's admonitions were sufficient to apprise Gholston that she should report any incident outside the courthouse involving a person connected to the trial. The record before us does not support this contention. Petitioner has culled the trial transcript for all juror instructions and admonitions that might indicate such an obligation. These disclose that the jury was told to avoid media reports and discussions about the case, and to avoid any contact or conversation, even social, with anybody connected with the trial. In one instance, jurors were also advised that such persons were required to stay away from them as well. However, no passage cited by petitioner, and none we have discovered from our own review, expressly or impliedly stated a juror's duty to *report* the juror's *mere observation* of a relative of the accused near the juror's residence. (Cf. *Carpenter, supra,* 9 Cal.4th 634, 641, 646-647 [jurors admonished to immediately *report* any attempt by a nonjuror to *discuss* the case].)[26]

Any claim of direct jury tampering, real or imagined, appears to fail at the threshold under California law. ▮ "[W]hen the alleged misconduct

---

[25]On the other hand, there is no risk that jury tampering on behalf of the defendant will undermine a subsequent judgment of *acquittal.* The People have no right to obtain a new trial on the basis of jury taint. (See §§ 1181, 1238.)

[26]Under these circumstances, we cannot infer misconduct from Gholston's own vague recollection, in 1997, that during the 1982 trial, the judge had indicated the court "would take care of any trouble" and that "we were supposed to tell him I suppose" if any unsettling incident occurred. In any event, even if there were misconduct in failing to report the incident,

involves an unauthorized communication with or by a juror, the presumption [of prejudice] does not arise unless there is a showing that the content of the communication was about the matter pending before the jury, i.e., the guilt or innocence of the defendant. [Citations.]" (*Federico, supra,* 127 Cal.App.3d 20, 38; see also *Cobb, supra,* 45 Cal.2d 158, 161.) ▮▮▮ As described by Gholston, the alley incident included no "communication" about the trial, only a brief, nonverbal observation of persons parked outside her home.

Finally, if the incident, real or imagined, might be interpreted as an improper attempt to intimidate Gholston by silent menace, the result is no different. The objective circumstances give rise to no substantial likelihood that the encounter resulted in Gholston's actual bias against petitioner.

The episode described by Gholston was brief, isolated, and ambiguous. The people Gholston saw parked in her alley did not approach or speak to her. Gholston mentioned no display of weapons or threatening gestures. According to Gholston, the two individuals simply sat in their car, and they drove away rapidly the instant they realized that Gholston had seen them. By Gholston's own account, "it never occurred to [her]" to report the incident to the trial court. She further insisted she never discussed the incident with other jurors, and there is no contrary evidence. (Cf., e.g., *Nesler, supra,* 16 Cal.4th 561, 583 [juror's repeated reference during deliberations to information heard outside trial suggests bias]; *Carpenter, supra,* 9 Cal.4th 634, 657 [evidence that juror did not discuss extraneous information with other jurors tends to negate inference of bias].) That Gholston even made a police report, as she claims, is in substantial dispute. This state of the record weighs against any assumption that Gholston found the incident sufficiently unsettling to affect her trial impartiality.

Like the referee, we thus find no substantial likelihood that the alley incident described by Gholston caused her to develop actual bias against petitioner. It follows that the episode affords no basis for relief on habeas corpus.

*Cumulative prejudice*

With respect to each individual matter we asked the referee to examine, we have found no substantial likelihood of juror bias. We reach the same

---

it would be "passive" only, and the inference of resulting bias would be weak. "Many jurors, in the middle of a long and notorious trial, might, for many reasons unrelated to bias, be reluctant to go forward and actively inject themselves into the proceedings. . . ." (*Carpenter, supra,* 9 Cal.4th 634, 656.)

conclusion when we view these matters collectively. For the reasons discussed above, the individual significance of each of the incidents in question is insufficient to suggest a probability that together they produced a biased juror. Therefore, in this regard as well, no ground for relief on habeas corpus is established.

*Other claims*

Because our order to show cause, and our subsequent reference order, were confined to specific claims of bias and misconduct by Juror Gholston, we do not address herein either the merits of any other claims set forth in the petition, or any procedural bars that might apply to such claims. The petition for habeas corpus itself will be resolved, as is our normal procedure, by a separate order.

### DISPOSITION

The order to show cause is discharged.

George, C. J., Mosk, J., Kennard, J., Werdegar, J., Chin, J., and Brown, J., concurred.

**CHIN, J.**—I concur fully in Justice Baxter's opinion. This case presents very troubling facts, troubling not because they show jury misconduct but because they show the lengths to which petitioner's counsel apparently went to generate a claim of misconduct.

In 1982, 12 people were chosen for the difficult task of being jurors in a death penalty case. After they rendered their verdicts, they no doubt believed that they had done their duty, and their task was completed. They were wrong.

In 1989, seven years after trial, petitioner's counsel contacted these jurors seeking grounds to claim jury misconduct. She discovered no evidence of misconduct. Undaunted, in 1994, two new investigators questioned some of the jurors and induced several to sign declarations, including Juror Gholston, who was 76 years old at the time. Petitioner then filed this petition for writ of habeas corpus accusing Gholston of committing serious misconduct at the trial 12 years earlier. Due to these allegations, we issued an order to show cause and ordered an evidentiary hearing. At the age of 79, and 15 years

after she believed her jury service had concluded, the accused juror was forced to defend herself at a new trial in which she was, in effect, the defendant. She had to testify and subject herself to cross-examination about events of long ago and about the declaration she signed at petitioner's behest. Several other jurors also had to testify to defend against the charges.

At the hearing, the allegations were proven unfounded. Today, more than 16 years after trial, and after a lengthy and expensive evidentiary hearing, this court exonerates the accused juror, now an octogenarian. But at what cost to the criminal justice system and to citizens called on to perform one of the most onerous of civic duties?

Although the referee made no specific findings regarding the investigation leading to the allegations, and we need not do so either, the record suggests that the investigators were more interested in generating a misconduct claim where their predecessor had failed than they were in the truth. Enough former jurors testified about questionable investigative tactics to cause serious concern. Jurors are not paid enough for their service to have to relive that service and defend themselves against unfounded accusations years after trial.

This court's experience with other capital habeas corpus petitions suggests that this case is but an extreme example of what is almost a routine practice of trying to create misconduct claims. At the least, it appears that, even absent any basis to suspect misconduct, investigators routinely question jurors in the hope that one will say something to support a claim of misconduct by that or some other juror. Obviously, there must be a mechanism for redress on those rare occasions when the jury system has indeed gone awry, and actual misconduct taints the verdict. But fishing expeditions by litigants who lost at trial must not transform the quest for misconduct claims into the witch-hunts of the next millennium. Somehow a balance must be found. The majority makes some useful suggestions, and existing law, including recent legislation, provides jurors some protection. (Maj. opn., *ante*, at pp. 303-304, fn. 23.) But perhaps the time has come for the Legislature to enact a comprehensive "Juror Bill of Rights" designed to protect jurors from intrusive tactics while at the same time permitting reasonable means to expose the occasional genuine case of jury misconduct.

The Legislature might regulate the circumstances under which investigators may contact jurors; prescribe what they must inform those jurors (e.g., that they are investigators, that they represent one of the parties, that they are investigating possible claims of misconduct or other grounds to overturn the

verdict, and that the jurors may refuse to talk to them); and require them to inform jurors from whom they seek a declaration that they might present the declaration to a court and to supply the jurors with a copy of the declaration. These are only ideas. There may be many ways to achieve a proper balance between conflicting policies. But this case strongly suggests that jurors need more protection than they currently have.

Petitioner's application for a rehearing was denied June 30, 1999, and the opinion was modified to read as printed above.