Filed 4/11/16  P. v. Vierra CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DANIEL LOUIS VIERRA,<br><br>        Defendant and Appellant. | A140920<br><br>(Solano County<br>Super. Ct. No. FCR302727) |

Daniel Louis Vierra (appellant) appeals from a judgment entered after a jury convicted him of misdemeanor corporal injury on a cohabitant (Pen. Code, § 243, subd. (e)(1)[1]) and the trial court sentenced him to 60 days in jail and three years of formal probation.  He contends the court "deprived [him] of his state and federal constitutional rights to an unbiased jury" by declining to hold an evidentiary hearing regarding alleged juror misconduct.  We reject the contention and affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

On September 26, 2013, a felony complaint was filed charging appellant with one count of corporal injury on a cohabitant (§ 273.5, subd. (a)).

The complaint was based on an incident that occurred on September 7, 2013.  That day, V.R. and appellant, who was her boyfriend and former husband, got into an argument because appellant's daughter from another relationship was moving in with them, apparently unannounced.  Upset, V.R. went into the master bedroom and started

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

yelling. She grabbed a candy machine from the top of the television and began shaking it. Appellant came in, shut the door, and struck V.R. in the face with a bowl that had been sitting on the dresser. The blow caused V.R. to fall backwards into the closet, where she hit a shelf. She sustained a black left eye and scrapes on her shoulder and under her armpit. She left and went to her mother's house.

The next day, V.R. called her supervisor to tell him she could not come into work because she had a black eye. V.R. explained she had been struck by appellant during a fight and was moving out. Her supervisor called the police. V.R. and a friend returned to her and appellant's home to get her belongings. Appellant was there and called 911 to report that V.R. was "creating some type of scene." He called back 20 minutes later to report that things had calmed down, but Fairfield Police Officer Richard Shaffer responded to the home anyway because of the call the police department had received from V.R.'s supervisor.

When Shaffer arrived, V.R. and a friend were loading V.R.'s things into a U-Haul truck. V.R., who had a black eye and bruising on her arm, told Shaffer that on the previous day, appellant "got angry, grabbed a bowl[,]" and "smacked [her] in the face with a bowl," causing her to fall backwards into some furniture. Appellant told Shaffer that V.R. caused the bowl to fall by shaking a candy machine, and that when he "lunged" to catch the falling bowl, "the bowl struck . . . V.R. in the face and caused her to fall down."

The People introduced evidence that appellant assaulted V.R. during a prior incident in 2008. Retired Fairfield Police Officer Dale Golez testified that in May 2008, he went to a house in response to a 911 call and heard a man and a woman yelling and screaming; the man's voice was the dominant one. Through a window, he saw the man, later identified as appellant, draw his arm up and forward, as if he was going to punch forward. Anticipating an attack, Golez ordered appellant to open the door, and appellant complied. A woman, identified as V.R., was crying and looked afraid and upset, as she told Golez that appellant slapped her, took her cell phone and broke it in half, and

2

threatened her, saying, "I'm going to murder you or I'm going to kill you." Golez recovered the broken phone at the scene.

V.R. resumed her relationship with appellant shortly after the September 7, 2013 incident. She testified that when she and appellant discussed the September 7, 2013 incident, appellant "mentioned that it shouldn't be—we shouldn't be going to court for this." She testified that she and appellant "both said it was an accident." She explained that she had accidentally dislodged the bowl by shaking the candy machine, and that appellant had grabbed the bowl right as it "hit [her] in the nose," causing her to "los[e] her balance." V.R. admitted calling her supervisor to say she could not go to work, but said she "didn't know" or "didn't think" she told him that appellant struck her. She denied, did not know, or did not recall telling Shaffer that appellant hit her with the bowl, saying at one point: "I just don't remember saying that, because I didn't want him to go to jail. It was an accident." V.R. also denied that appellant slapped her in 2008, stating that he pinned her against a wall and that "[i]t wasn't an actual slap. It was his forearm that hit my chin and he had me up against the wall." V.R. also denied he grabbed her cell phone and broke it; she said the phone broke because she and appellant were grabbing it at the same time.

Appellant testified in his own defense. Regarding the current incident, he testified that V.R. "just flipped out" and went to the bedroom and started "banging stuff around," including the candy machine. Appellant went into the bedroom to calm her down, but a bowl fell from the top of the dresser. He tried to catch the bowl, but "[i]t hit her. It hit her in the face. And where she was standing, there was all kinds of boxes and stuff. Pushed her backwards. When she went backwards, . . . I guess it hit the little shoe stand thing back here and scratched her up." "[W]hen she fell back, I guess she hit her thing, we figured that out later. But she started freaking out. Oh, my God, oh, my God, you know. I don't know. She's overdramatic."

Regarding the 2008 incident, appellant said he raised his arm towards V.R. but just to tell her "to get the hell out." He denied slapping V.R. and said he grabbed her only to prevent her from assaulting his daughter. After grabbing V.R., he "put her on the

3

ground" and left.  Appellant admitted he threw V.R.'s phone and broke it, but said he did so because V.R. threw the phone first and he was tired of her destroying things.  He denied saying he was going to murder her.

The jury departed for deliberation at 12:19 p.m. and notified the trial court at 1:40 p.m. the same day that it had reached a verdict.  The jury found appellant not guilty of felony corporal injury on a cohabitant (§ 273.5, subd. (a)) but found him guilty of the lesser included offense of misdemeanor battery on a cohabitant (§ 243, subd. (e)(1)).  The court sentenced him to 60 days in jail and three years of formal probation and ordered him to attend 52 weeks of domestic violence counseling and pay various fees and fines.

## DISCUSSION

Appellant contends the court "deprived [him] of his state and federal constitutional rights to an unbiased jury" by declining to hold an evidentiary hearing regarding alleged juror misconduct.  We reject the contention.

### *Background*

A "voir dire juror questionnaire" asked potential jurors:  "Are you, a close friend, relative, or person with whom you have a significant personal relationship employed by a federal, state, or local law enforcement agency?  If yes, what agency?"  Juror No. 3 wrote in response:  "(Yes) Fairfield P.D."

At the beginning of voir dire, the trial court read a list of witnesses to potential jurors, stating, "I'm going to tell you who they are, just to give you a preview, in case you know them."  The list included Shaffer and Golez.  At the time, 18 prospective jurors— not including Juror no. 3—were seated in the box out of a total of 50 summoned.  The court asked the jurors in the box:  "Anyone know the trial participants?  Anyone know of any of the lawyers?"  One seated prospective juror whose wife had spent 30 years with the Fairfield Police Department, said, "Officer Golez, I think, is probably the only familiar face to me."

A series of questions and answers took place between the trial court and the prospective jurors who were in the box.  After a round of peremptory challenges, Juror No. 3 was seated in the box along with six other prospective jurors.  The court asked the

4

group, "anyone have any reason why they couldn't keep an open mind and be fair to both sides in this domestic violence case?" Two prospective jurors raised some issues, and the court thereafter asked each of the seven prospective jurors specific questions. Juror No. 3 made no indication that he could not be fair and impartial.

The trial court eventually questioned Juror No. 3 about his questionnaire:

"THE COURT: You know some folks in [the] Fairfield Police Department?

"JUROR NUMBER 3: Yes.

"THE COURT: Who?

"JUROR NUMBER 3: Trojanowskis.

"THE COURT: The older and younger Trojanowski?

"JUROR NUMBER 3: Both of them.

"THE COURT: Neither of them are on this case. Are you going to be okay with—

"JUROR NUMBER 3: That's fine."

During voir dire, defense counsel asked the prospective jurors if they would credit a police officer's testimony simply because he or she was an officer. Juror No. 3 said "No." Defense counsel also asked whether the fact that appellant was charged with a crime made it difficult for the jurors to presume him innocent. Juror No. 3 did not indicate he had any such difficulty. Later, when told the jury would be presented with evidence of appellant's past conduct, Juror No. 3 said he would not hold any such conduct against appellant: "No. Take the evidence as it was presented." Finally, defense counsel asked if any of the jurors had been falsely accused of something they did not do. Juror No. 3 volunteered that he had, stating, "Going back to my childhood, I'm sure everybody has."

After several more rounds of peremptory challenges, the jury was sworn, and the parties broke for lunch. When they returned, the prosecutor said that while "chit-chatting with Officer Golez," he learned that Golez and Shaffer "have a longstanding professional relationship with [Juror No. 3]. That he owns a tow company here and they've worked and socialized on the job for many years." "So I don't know why that wasn't mentioned by [Juror No. 3]. But both officers have informed me of this and wanted the Court to

5

know." Presumably referring to the fact that Shaffer had not been present during voir dire, the trial court stated, "That's one of the benefits of having an investigating officer present during voir dire." Defense counsel said, "Your Honor, I would have liked to have known this information during jury selection. It may have added to my decision whether or not to keep [Juror No. 3], whether or not he had a longstanding relationship with two of the main police officers in this case."

The trial court noted that the questionnaire had asked whether prospective jurors had "any friends, relatives, or person with whom you have a significant personal relationship" in law enforcement, and that Juror No. 3 had "certainly [done] his part" by responding that he did. The court also noted that Juror No. 3 had not been in the box when the court asked whether the prospective jurors knew anyone who was involved in the trial. The court found Juror No. 3 had not lied to the court. The prosecutor said he was not seeking a remedy and had instructed the officers not to speak to Juror No. 3 during the course of the trial. The court asked, "Anything else?" Defense counsel did not request a remedy and instead raised a different issue.

Trial began. The next day, and after three prosecution witnesses testified, counsel moved for a mistrial based on "the nondisclosure of the relationship that I believe [Juror No. 3] . . . has had with Officer Shaffer and Officer Golez." Counsel said, "It's a difference between whether or not [Juror No. 3] had a relationship or knew officers of the Fairfield Police Department, and not a close working relationship [that] was provided to [the prosecutor] and [me] after the noon hour as of yesterday." The prosecutor responded, "This is a case where the juror did mark on his questionnaire that he knew the Fairfield Police Department. I don't think anyone further touched on it. So I think he did disclose it. I don't see the issue now. [¶] [Defense counsel] had the information he did know Fairfield Police Department. I don't think that questionnaire says to describe who and the exact nature of the relationship. It gives notice to the attorney that that exists for them to further explore, and that wasn't further explored."

The trial court denied the motion, reiterating that Juror No. 3 said "yes" and noted "Fairfield P.D." when asked on the questionnaire if he had "a close friend, relative, or

6

person with whom you have a significant relationship, personal relationship [who was] employed by a federal, state, or local law enforcement agency." The court stated, "Each party had an opportunity to ask him questions concerning those relationships . . . He heard all of the questions asked. None of them posed any problems to him. And no questions were asked by the parties, so a mistrial is not proposed."

*Analysis*

Section 1089 provides that a juror may be discharged and replaced if "unable to perform his or her duty." The trial court's "decision whether or not to discharge a juror under section 1089 is reviewed for abuse of discretion and will be upheld if supported by substantial evidence." (*People v. Holloway* (2004) 33 Cal.4th 96, 124–125.) "[T]o warrant discharge the juror's bias or other disability must appear in the record as a demonstrable reality." (*Id.* at p. 126.) Although " 'juror misconduct involving the concealment of material information on voir dire raises the presumption of prejudice' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1208), unintentional or inadvertent failures to disclose information are not accorded the same effect (*People v. McPeters* (1992) 2 Cal.4th 1148, 1175, superseded on another ground as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106). In cases of unintentional concealment, the court evaluates "whether the juror is sufficiently biased to constitute good cause for the court to find . . . that he is unable to perform his duty." (*People v. Wilson* (2008) 44 Cal.4th 758, 823.) "[A]n honest mistake on voir dire cannot disturb a judgment in the absence of proof that the juror's wrong or incomplete answer hid the juror's actual bias." (*In re Hamilton* (1999) 20 Cal.4th 273, 300.)

" ' " 'Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty "to make whatever inquiry is reasonably necessary" to determine whether the juror should be discharged.' " ' " (*People v. Cowan* (2010) 50 Cal.4th 401, 505–506, quoting *People v. Martinez* (2010) 47 Cal.4th 911, 941–942.) "However, ' "not every incident involving a juror's conduct requires or warrants further investigation. 'The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—

7

rests within the sound discretion of the trial court.' " ' " (*People v. Cowan*, *supra*, 50 Cal.4th at p. 506.) " ' " '[A] hearing is required only where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties and would justify his removal from the case.' " ' " (*Ibid.*) The reviewing court's "assessment of the adequacy of a court's inquiry into juror misconduct is deferential: We have long recognized that, except when bias is apparent from the record, the trial judge is in the best position to assess the juror's state of mind during questioning." (*People v. Clark* (2011) 52 Cal.4th 856, 971.)

In *People v. Cowan*, *supra*, 50 Cal.4th at p. 507, Juror No. 040149 informed the trial court during penalty phase deliberations in a death penalty case that another juror, Juror No. 045829, was having "second thoughts about her original verdict in the two convictions." Juror No. 040149 was concerned because he had observed the juror sitting next to two of the defendant's relatives, who were also witnesses in the case. (*Id.* at p. 504.) He stated, "All I could see is the back of her head. I don't know if she was conversing with them. I did note that they were talking and . . . I don't know if maybe she heard something that she is now, you know, holding up or trying to recant or whatever." (*Ibid.*) Thereafter, Juror No. 045829 asked to speak to the court and said, "Well, the other juror said I was talking, he thought I was talking to the—" to which the court responded, "He didn't say that. . . . He said that he . . . saw you sitting in the hallway, sitting next to some members of the defendant's family. He did not indicate that he saw you talking to anyone . . . ." (*Ibid.*) The court informed Juror No. 045829 that it was not going to take any further action "because there wasn't anything indicated by that juror that would have suggested any impropriety on your part." (*Ibid.*)

On appeal, the defendant claimed the trial court erred by failing to investigate whether Juror No. 045829 had been speaking with the defendant's family members or had overheard anything connected with the trial. (*People v. Cowan*, *supra*, 50 Cal.4th at p. 505.) The Supreme Court held the trial court did not abuse its discretion in declining to inquire further into Juror No. 045829's alleged contact with the defendant's family members: "At best, the trial court possessed ambiguous information suggesting that [the

8

juror] may or may not have been talking to defendant's relatives who also were witnesses at the penalty phase. . . . Although Juror No. 045829 probably should not have been sitting near [the] defendant's relatives who were also witnesses, the trial court reasonably could have concluded that there were no grounds for believing that Juror No. 045829 had actually been engaged in a conversation with them. Moreover, there was no suggestion, other than Juror No. 040149's speculation, that anything that Juror No. 045829 said or heard had anything to do with the trial. Accordingly, the court reasonably could have concluded that there were no grounds for believing good cause to excuse Juror [No.] 045829 might exist." (*Id.* at pp. 507–508, citing *People v. Cobb* (1955) 45 Cal.2d 158, 161 [trial court did not abuse its discretion in failing to investigate communication between juror and the defendant's relative, where it did not appear that the communication related to the trial].)

Here, while the trial court could have easily inquired into Juror No. 3's relationship with Shaffer and Golez, we cannot conclude that its decision not to do so was an abuse of discretion. As the court noted, Juror No. 3 was forthcoming in his juror questionnaire when he stated he had a "close" or "significant personal relationship" with "Fairfield P.D." During voir dire, when asked to specify with whom at the Fairfield Police Department he had this type of relationship, Juror No. 3 responded with the names of two police officers. Neither the court nor the parties inquired further about his questionnaire response.

Although the court had earlier asked, "Anyone know the trial participants? Anyone know any of the lawyers?", Juror No. 3 was not sitting in the box at the time the question was asked, and further proceedings—voir dire and peremptory challenges—took place before Juror No. 3 was seated. Moreover, Shaffer and Golez shared only a professional relationship with Juror No. 3 through his tow company. Thus, even if Juror No. 3 had heard the court's initial reading of the witnesses' names, it was unclear

9

whether he would have recognized the officers by name,[2] or would have remembered his acquaintance with them without prompting.

The record also shows that Juror No. 3 responded appropriately to other questions asked of him during voir dire. He responded "No," when asked whether he would credit a police officer's testimony simply because he or she was an officer. He did not indicate he would have difficulty presuming appellant's innocence. He said he would not hold appellant's past conduct against him, stating, "No. Take the evidence as it was presented." (See *In re Hamilton*, *supra*, 20 Cal.4th at p. 300 ["the juror's good faith when answering voir dire questions is the most significant indicator that there was no bias"].)

On this record, and particularly given Juror No. 3's other forthcoming disclosures, we conclude it was reasonable for the court to determine that Juror No. 3 had not concealed material information, and that further inquiry was unnecessary.[3]

## DISPOSITION

The judgment is affirmed.

---

[2]As noted, it appears the officers were not present during voir dire.

[3]It is unclear whether appellant is also claiming the trial court deprived him of his constitutional right to an impartial jury and abused its discretion in *failing to discharge Juror No. 3*. To the extent that he is, we conclude he forfeited the issue. (*People v. Majors* (1998) 18 Cal.4th 385, 428; *People v. Gallego* (1990) 52 Cal.3d 115, 188.) Having expressed no desire to have Juror No. 3 discharged, appellant " 'is not privileged to make that argument now for the first time on appeal.' " (*People v. Holloway, supra,* 33 Cal.4th at p. 124.) In any event, for the reasons set forth above, we conclude the record does not establish the court abused its discretion or deprived appellant of an impartial jury by leaving Juror No. 3 on the panel.

_____
McGuiness, P.J.

We concur:


_____
Pollak, J.


_____
Jenkins, J.