Filed 6/16/20

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

ANTHONY ALBERT et al.,

    Defendants and Appellants.

E071365

(Super.Ct.No. FWV1405287)

OPINION

APPEAL from the Superior Court of San Bernardino County. Jon D. Ferguson, Judge. Affirmed with directions.

Matthew A Siroka, under appointment by the Court of Appeal, for Defendant and Appellant Anthony Albert.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant Noah Roosevelt Davis.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Christine L. Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

---

    * Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.B through II.D.

After the verdict in this case, a juror asserted that during the trial he had been visited at home by a man who purported to be the brother of one of the defendants, causing the juror to be scared. The trial court denied a new trial motion brought by defendants and appellants Anthony Albert and Noah Roosevelt Davis due to that incident, leaving in place their convictions of first degree murder and gang participation. In the published portion of this opinion, we reject defendants' claim that we should presume that the juror had a bias that violated the defendants' constitutional rights, and thus we affirm the convictions. In the unpublished portion of this opinion, we modify the judgment to correct certain sentencing errors (which the People concede), order the correction of clerical error in defendants' abstract of judgment, reverse the orders imposing a $10,000 criminal restitution fine on each defendant, and remand for a hearing on defendants' ability to pay the fines.

## I. FACTUAL AND PROCEDURAL HISTORY

One night in 2014, defendants and three other men were riding in a car in Rialto. According to Calvin Ransom, one of the men in the car, the group passed by a pedestrian who associated with a rival gang.[1] One of the men stated that the pedestrian, David Richardson, was an enemy, so they parked the car at a nearby apartment complex and grabbed a gun. The men approached a gate, and Davis held the gate open while Albert, who had the gun, crossed onto the street where the "enemy" was. Ransom then heard

---

[1] Ransom was in the same gang as defendants and was also charged with the crimes at issue here, but Ransom pleaded guilty pursuant to a plea bargain and testified for the prosecution at trial. For clarity, when we use the term defendants, we refer to Albert and Davis, but not Ransom.

gunshots. The men then ran back into the car and drove off. Later that night, Albert told Ransom, "those gunshots that you heard that was me. I did that. I killed him." Richardson sustained seven gunshot wounds and died at the scene.

The jury convicted both defendants of first degree murder (Pen. Code, § 187, subd. (a), count 1; undesignated statutory references are to the Penal Code) and street terrorism, sometimes referred to as gang participation (§ 186.22, subd. (a), count 2; see *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1128, fn. 2). As to the murder charge, the jury found true allegations that defendants committed the murder "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members" (§ 186.22, subd. (b)(1) (the gang enhancement)), as well as allegations that Albert personally used a firearm, personally and intentionally discharged a firearm, and personally and intentionally discharged a firearm proximately causing great bodily injury or death (§ 12022.53, subds. (b)-(d) (the firearm enhancements)). Davis had similar underlying firearm enhancements found true by the jury, except that he was alleged to be only a principal in the offense, not the actual shooter. (§ 12022.53, subd. (e)(1).)

Defendants then filed separate motions for a new trial, contending that one of the jurors demonstrated prejudicial bias. In an affidavit attached to the motions, Juror No. 8 stated the following:

"One day during the trial but after the trial was completed for that day I heard a knock at my door. [¶] There was a young black man at my door. [¶] I did not recognize

3

him.  [¶]  He stated 'you are a juror on my brother's case.'  [¶]  I said I can't talk about the trial and how do you know where I live?  [¶]  He looked really scared and said 'You are right I better get out of here.'  [¶]  It was a scary situation.  [¶]  He is lucky I didn't shoot him[.]  [¶]  After that incident I began carrying a legal firearm because I didn't know what his intentions were and I was nervous after the contact.  I have a[n] exposed weapons permit.  [¶]  I did not report the incident to the court."

The trial court denied the motions.

The trial court sentenced Albert to a total term of 60 years to life, the term resulting from the murder charge (25 years to life), the firearm enhancement under section 12022.53, subdivision (d) (25 years to life), and the gang enhancement (10 years, pursuant to § subd., (b)(1)(C)), with 1,368 days of credit for time served.  Davis was sentenced to a total term of 50 years to life, resulting from the murder charge and the firearm enhancement under section 12022.53, subdivision (d) (made applicable to Davis pursuant to section 12022.53, subdivision (e)(1)), with the same amount of credit for time served.  Sentences were imposed but stayed for all other counts and enhancements as to both defendants.  Ultimately, this meant that Davis's sentence was shorter than Albert's only because Davis's gang enhancement was stayed.  The trial court also imposed, among other fines and fees, and over defendants' objections, a $10,000 restitution fine pursuant to section 1202.4, subdivision (b) on each defendant.

## II. ANALYSIS

### A. *Juror Bias*

Determining whether a jury is tainted by prejudicial bias is a contextual and factually specific inquiry. But as we explain, the circumstances here are markedly similar to those in a case where the California Supreme Court rejected a similar claim of juror bias. With that case guiding much of our analysis here, we find no substantial likelihood of prejudicial bias.

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is '"capable and willing to decide the case solely on the evidence before it"' [citations]." (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294 (*Hamilton*).) "The jury's impartiality may be challenged by evidence of '*statements* made, or conduct, conditions, or *events* occurring, either within or without the jury room, of such a character as is *likely* to have influenced the verdict improperly.'" (*Id.* at p. 294, citing Evid. Code, § 1150, subd. (a).) However, "due process does not require a new trial every time a juror has been placed in a potentially compromising situation." (*Smith v. Phillips* (1982) 455 U.S. 209, 217.) Accordingly, "[t]he verdict will be set aside only if there appears a *substantial likelihood* of juror bias." (*In re Carpenter* (1995) 9 Cal.4th 634, 653, (*Carpenter*), italics added.)

Bias can appear in two different ways. "First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the

5

juror. [Citations.] Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant. [Citation.] The judgment must be set aside if the court finds prejudice under either test." (*Carpenter*, *supra*, 9 Cal.4th at p. 653.)[2]

"Misconduct by a juror, or a nonjuror's tampering contact or communication with a sitting juror, usually raises a rebuttable 'presumption' of prejudice." (*Hamilton*, *supra*, 20 Cal.4th at p. 295.) However, "[a]ny presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice . . . ." (*Id.* at p. 296.)

"'Whether prejudice arose from juror misconduct . . . is a mixed question of law and fact subject to an appellate court's independent determination.' [Citation.] However, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.'" (*People v. Danks* (2004) 32 Cal.4th 269, 303-304.)

Here, we have a situation where (1) a defendant's sibling who (2) learns where a juror lives (3) goes to that juror's house (4) during the trial and, although (5) no overt threat or other communication about the merits of the case is made, (6) causes the juror to

---

[2] Although defendants cite the law as to both inherent bias and actual bias in their briefs, they meaningfully contend only that there was actual bias here. In any event, if, for the reasons discussed below, there is no actual bias, then it follows that there can be no inherent bias.

begin seeking additional personal protection (7) without informing the court about the incident.  In *Hamilton*, *supra*, 20 Cal.4th 273 the California Supreme Court held that no actual bias existed in a situation containing all seven of these features.

*Hamilton* involved a juror, Geneva Gholston, who, several years after a trial, averred that "during trial, [she] saw the 'skinnier' of [the defendant's] sisters watching her from a car in the alley behind [her] home, which prompted [her] to request increased police patrols."  (*Hamilton*, *supra*, 20 Cal.4th at pp. 282-283, fn. omitted.)  The incident had not been "brought to the attention of court or counsel" during the trial.  (*Id.*, at p. 283.)  During a subsequent evidentiary hearing, Gholston elaborated further.  According to the court's description of her testimony at that hearing:

"Gholston was afraid of the [defendant's] family, sisters and mother, throughout their attendance at the trial.  Gholston and other jurors had expressed such concerns among themselves.  Gholston avoided going to the courthouse restroom alone, and jurors tended to band together to walk to the parking lot.  As the 1994 declaration stated, Gholston had read detective novels, and she assumed petitioner could arrange to have a juror killed.

"The incident in the alley occurred shortly before guilt deliberations began.  Gholston had just returned home from a day in court, and she came outside to shut an open gate.  She observed [the defendant's] sister and the sister's boyfriend sitting in a car in the alley.  They must have seen her in turn, because they sped away immediately.  Gholston was 'positive' of the pair's identity because she had just seen them at the trial.

7

"Gholston did not report this incident to the court, though she should have done so. However, she did immediately contact her friend, police dispatcher Rosalee Patterson, to request increased patrols. She was 'sure' there were increased patrols for some time thereafter, though she did not actually notice them . . . . She never told other jurors about the alley incident itself 'because we weren't supposed to talk about this,' though she may thereafter have repeated to another juror her general fear of [the defendant's] family." (*Hamilton*, *supra*, 20 Cal.4th at pp. 287-288, fn. omitted.)

The court noted that there was no evidence independently corroborating the alley incident, and that the police dispatcher "testified she recalled no such report from Gholston and would remember or know if it occurred." (*Hamilton*, *supra*, 20 Cal.4th at p. 304.)

The court held that the alley incident did not actually bias Gholston, for "several" reasons. (*Hamilton*, *supra*, 20 Cal.4th at p. 306.) It stated that "'[w]hen the alleged misconduct involves an unauthorized communication with or by a juror, the presumption [of prejudice] does not arise unless there is a showing that the content of the communication was about the matter pending before the jury, i.e., *the guilt or innocence of the defendant*.'" (*Id.* at pp. 305-306, italics added.) Because the "alley incident included no 'communication' about the trial," the juror bias claim "appear[ed] to fail at the threshold under California law." (*Ibid.*)

The court also concluded that the "objective circumstances" surrounding the alley incident "[gave] rise to no substantial likelihood that the encounter resulted in Gholston's

8

actual bias against petitioner." (*Hamilton*, *supra*, 20 Cal.4th at p. 306.)  As the court noted, the alley incident was "brief, isolated, and ambiguous"; there was "no display of weapons or threatening gestures"; and Gholston "insisted she never discussed the incident with other jurors, and there is no contrary evidence." (*Ibid.*)  The "state of the record" thus "weigh[ed] against any assumption that Gholston found the incident sufficiently unsettling to affect her trial impartiality." (*Ibid.*)

In a footnote, the Court explained that to the extent Gholston committed juror misconduct in failing to report the incident, such misconduct "would be 'passive' only, and the inference of resulting bias would be weak." (*Hamilton*, *supra*, 20 Cal.4th at p. 305, fn. 26.)  The characterization of misconduct as "passive" was a reference to a description used in *Carpenter*, a case where a juror learned of outside information from the newspaper and her husband. (*Carpenter*, *supra*, 9 Cal.4th at p. 642.)  There, the court similarly found the juror's failure to report her exposure to the information as "passive" and thus insufficient to show bias. (*Id.* at p. 656.)

Finally, although it expressed no formal view on the matter, *Hamilton* "question[ed] whether a convicted person can *ever* overturn [a] verdict on grounds that persons *acting in his behalf* deliberately sought to influence the jury." (*Hamilton*, *supra*, 20 Cal.4th at p. 305, first italics added.)  As the court stated: "Certainly no such claim could ever be valid where the *accused himself* had instigated the incident; a party cannot profit by his or her own wrongdoing.  But even where, as here, there is no evidence [the defendant] was directly involved, recognition of such a claim suggests tempting

9

opportunities for accuseds' allies to manufacture challenges against subsequent conviction." (*Ibid.*, fn. omitted.)

Each of the rationales described above applies with equal force to this case. In this case and in *Hamilton*, a sibling promoting a defendant's cause approached a juror at the juror's home, even though there was no evidence the defendant directed the sibling to do so. In neither case did the sibling convey any communication about the case's *merits* (i.e., the true "'matter pending before the jury'" (*Hamilton*, *supra*, 20 Cal.4th at p. 306)). In both cases, the encounter was "brief, isolated, and ambiguous" with "no display of weapons or threatening gestures" (*ibid.*); the encounter between Juror No. 8 and one of the defendants' brothers lasted no more than a few moments; and there is no indication that any other similar event occurred. In both *Hamilton* and here, the juror took steps to increase his or her personal security—or, at least in *Hamilton*, the juror believed she did so, which is the relevant frame of reference for an analysis on *juror* bias. And in both cases—as well as in *Carpenter*, *supra*, 9 Cal.4th 634—the failure to report was "passive" misconduct at worst.[3]

_____

[3] It is not clear whether *Hamilton*, *supra*, 20 Cal.4th 634 described the misconduct as "passive" because the juror was exposed to an outside influence inadvertently (rather than purposely), or because the juror did not actively conceal the contact (such as by lying), or both these things. (Cf. *People v. Nesler* (1997) 16 Cal.4th 561, 597 (*Nesler*) (dis. opn. of Baxter, J.) (characterizing both inadvertent receipt of information and failure to report as "passive" misconduct).) Regardless, we do not think *Hamilton* and *Carpenter* meant that whether conduct is passive should turn on the length of a trial or whether the case has been widely reported in the news, though those cases stated that "'[m]any jurors, in the middle of a *long* and *notorious* trial, might, for many reasons unrelated to bias, be reluctant to go forward and actively inject themselves into the proceedings.'" (*Hamilton*, at p. 305, fn. 26, citing *Carpenter*, *supra*, 9 Cal.4th at p. 656,

We note some distinctions between *Hamilton* and the facts here, but the distinctions are not legally salient. First, in *Hamilton*, Gholston "insisted she never discussed the incident with other jurors" (*Hamilton*, *supra*, 20 Cal.4th at p. 306), but here Juror No. 8 does not make a similar statement, and the record is silent on the topic. The result, however, is the same. Whether a juror shares outside information (such as an attempt at juror influence or intimidation) with other jurors during deliberations is a question worth examining in ascertaining prejudicial bias. (Compare *Nesler*, *supra*, 16 Cal.4th at p. 583 (lead opn. of George, C.J.) [juror's "repeated references to and use of the outside information" pointed toward bias] with *Carpenter*, *supra*, 9 Cal.4th at p. 657 [fact that juror did not discuss outside knowledge both "tend[ed] to negate the inference the juror was biased," because "a biased juror would likely have told other jurors what she had learned," and "tend[ed] to show the juror intended the forbidden information *not* to influence the verdict"].) However, "the initial burden is on defendant to prove the misconduct," and "[w]e will not presume greater misconduct than the evidence shows." (*Ibid.*) Accordingly, an absence of evidence showing that the incident was revealed to the other jurors cuts against any finding of bias here. (See *People v. Maury* (2003) 30 Cal.4th 342, 436 [rejecting as "speculative" argument that juror with extraneous information spoke to other jurors about it].)

---

italics added.) Those are reasons why jurors might be reluctant to have the proceedings focus upon them, but not the only ones. A juror may be of a disposition where they would not wish to be the focus of attention in any trial, and, in general, a juror also might not report an incident because "a juror might not attach the same importance to a particular piece of information as do the parties." (*Carpenter*, at p. 656.)

Second, we do not rely on the assertion that Juror No. 8 committed no misconduct, even though *Hamilton* relied on such a rationale. In *Hamilton*, the court stated that there was "no evidence Gholston's failure to tell the trial court of her experience was misconduct." (*Hamilton*, *supra*, 20 Cal.4th at p. 305.) It noted that the record before it contained no advisement that a juror should report a situation such as the alley incident to the court. (*Ibid.*) Here, on the other hand, the trial court did instruct the jury to report any attempted influence. In its preliminary instructions, the trial court informed the jury: "If you receive any information about this case from any source outside of the trial, even unintentionally, do not share that information with any other juror. If you do receive such information, *or if anyone tries to influence you or any juror*, you must immediately tell the bailiff." (Italics added.) Under *Hamilton*, however, this instruction makes no difference, because the court there stated that it would have found no substantial likelihood of bias "even if there were misconduct in failing to report the incident." (*Id.* at p. 305, fn. 26.) In considering and applying *Hamilton* above, we follow this alternative line of reasoning.

Thus, having independently reviewed the record, we conclude that there was no reasonable probability of prejudice here.

In arguing that a new trial is warranted, defendants contend that "the trial court abused its discretion by failing to hold a hearing to determine" whether Juror No. 8 was biased. The record, however, does not show that defendants ever asked for such a hearing. The moving papers contain no such request. The People's opposition to the

12

motions does not suggest that defendants made such a request. No replies to the motions are in the record. And the transcript of the new trial hearing contains no discussion of any such request. Under these circumstances, the trial court did not abuse its discretion. (See *People v Hayes* (1999) 21 Cal.4th 1211, 1256, 1259-1261 [failure to hold evidentiary hearing on motion for new trial based on juror misconduct not an abuse of discretion where "[d]efense counsel offered nothing to suggest that further inquiry by the court into the misconduct claim would have been productive" and issue of "[w]hether an evidentiary hearing should be held ever arose"].)

Accordingly, we find that the trial court correctly denied the motions for a new trial.

B. *Sentencing Errors*

Defendants argue that the trial court erred by imposing the gang enhancement. (As noted above, defendants' sentences differed in that the gang enhancement was imposed on Albert but imposed and stayed on Davis.) The People concede error, and for the reasons discussed below, we agree.

Because the analysis is somewhat different for Davis than it is for Albert, we address them separately to minimize potential confusion. We begin with Davis, who was not the actual shooter.

1. *Davis*

The trial court imposed a term of 25 years to life pursuant to the firearm enhancement under section 12022.53, subdivision (d), which applied to Davis as a

13

principal under section 12022.53, subdivision (e)(1).  This accordingly meant that section 12022.53, subdivision (e)(2) applied.  That provision states that "[a]n enhancement for participation in a criminal street gang . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally discharged a firearm in the commission of the offense."

Davis was not found to have personally used or discharged a firearm, and the gang enhancement the trial court imposed but stayed is one such "enhancement for participation in a criminal street gang."  (See *People v. Brookfield* (2009) 47 Cal.4th 583, 590 ["enhancement" in section 12022.53, subdivision (e)(2) includes sentence enhancements under section 186.22].)  In *Brookfield*, our Supreme Court held that where section 12022.53, subdivision (e)(2) applies, a trial court must determine whether the "enhancement for participation in a criminal street gang" (such as the gang enhancement here) or the enhancement imposed pursuant to section 12022.53, subdivision (e)(1) will result in a greater sentence, and impose only the greater one.  (*People v. Brookfield*, *supra*, at p. 596.)  The gang enhancement here is 10 years, and the firearm enhancement imposed under section 12022.53, subdivisions (d) and (e)(1) is 25 years to life.  Accordingly, we strike Davis's gang enhancement and order the judgment modified for count 1 to indicate a sentence of 25 years to life with another 25 years pursuant to the firearm enhancement under section 12022.53, subdivisions (d) and (e)(1).

## 2. *Albert*

For Albert, who was the shooter, the analysis is slightly different. Section 12022.53, subdivision (e)(2) provides him no relief here given that he was found to have personally used or discharged a firearm in the commission of the offense. His gang enhancement, however, was improper for a different reason.

The statute providing the gang enhancement states that, subject to important exceptions, any person who is convicted of what we will simply call a gang felony[4] is subject to additional punishment, depending on whether the gang felony was a serious felony, a violent felony, or neither. (§ 186.22, subd. (b).)

Here, however, one of those important exceptions applies. That exception states that (subject to its own exception not applicable here) anyone who commits a "felony that is punishable by imprisonment in the state prison for life shall not be paroled until a minimum of 15 calendar years have been served." (§ 186.22, subd. (b)(5).) In *People v. Lopez* (2005) 34 Cal.4th 1002, our Supreme Court held that first degree murder is a "felony punishable by imprisonment in the state prison for life" and that therefore the alternative penalty under section 186.22, subdivision (b)(5) (i.e., a 15-year parole minimum eligibility term), rather than the gang enhancement, applies. (*People v. Lopez, supra,*. at p. 1004.)

---

[4] The statute says "a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).)

We therefore strike Albert's gang enhancement and order the judgment modified for count 1 to impose the 15-year minimum parole eligibility term, even though we recognize that "[i]n this case, the 15-year minimum parole eligibility has little effect since it is subsumed in the 25-year minimum parole eligibility imposed for the underlying murder conviction" (*People v. Harper* (2003) 109 Cal.App.4th 520, 527).

C.  *Criminal Restitution Fines*

Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, defendants contend the trial court violated their due process rights when it imposed $10,000 criminal restitution fines under section 1202.4, subdivision (b) on each of them without making findings that defendants had a present ability to pay.

*Dueñas* rested on a due process analysis, but the People argue that the "proper analytical framework" is under the Eighth Amendment to the United States Constitution. Because the criminal restitution fines here are "subject both to the state and the federal constitutional bans on excessive fines as well as state and federal provisions barring violations of due process," however, "[i]t makes no difference whether we examine the issue as an excessive fine or a violation of due process." (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 728.)

The trial court did not determine defendants' present ability to pay the criminal restitution fines.  "Under *Dueñas*, this was error, and we must remand for an ability to pay hearing unless the error was harmless.  [Citation.]  *Dueñas* determined the error was of constitutional magnitude, so we inquire whether the failure to conduct an ability to pay

hearing was harmless beyond a reasonable doubt.  [Citation.]  We will find *Dueñas* error harmless if the record demonstrates, beyond a reasonable doubt, that the defendant cannot establish his or her inability to pay.  [Citation.]"  (*People v. Taylor* (2019) 43 Cal.App.5th 390, 401 (*Taylor*).)

As was the case in *Taylor*, "[t]he record here does not demonstrate" harmless error.  (*Taylor*, *supra*, 43 Cal.App.5th at p. 401.)  The record contains little information about defendants' financial situations:  it reveals only that at the time of their arrests in December 2014, Albert's monthly income as a laborer was $1,280 a month, and Davis was working for temp agencies for $10.50 an hour.  Although defendants were both 22 years old at the time of sentencing, there is no information about what savings or assets they have or what skills they possess.  Moreover, the court found that both defendants had  "no ability to reimburse the County for appointed counsel fees and [presentence] investigation costs," for which the probation officer recommended imposing $750 and $727, respectively, on each defendant.  "None of that information forecloses a meritorious inability to pay argument.  On the contrary, if [defendants] lacked the present ability to pay $750 in appointed counsel fees, it stands to reason that [they] lacked the present ability to pay [$10,000 in criminal restitution fines].  (§ 987.8, subd. (b) [the court determines the "present ability" of the defendant to pay appointed counsel fees].)" (*Taylor*, at pp. 401-402.)  Furthermore, given that "[w]ages in prison range from $12 to $56 per month" and that 50 percent of those wages would be deducted to pay any outstanding restitution fine (see *id.* at p. 402), 138.9 years would go by before the

minimum $6 a month deductions totaled $10,000.  We therefore do not find the error harmless and remand for an ability to pay hearing.

D.  *Clerical Error in the Abstracts of Judgment*

Despite the fact that defendants' convictions were the result of a jury trial, their abstracts of judgment erroneously state that the murder counts were the result of a plea agreement and that the gang participation counts were the result of a bench trial.  "Courts may correct clerical errors at any time," and "[i]t is, of course, important that courts correct errors and omission in abstracts of judgment."  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)  We order that the abstracts of judgment be corrected.

## III.  DISPOSITION

The judgment is modified to (1) strike the enhancement under section 186.22, subdivision (b)(1)(C) on count 1 for both defendants; and (2) for Davis only, impose the alternate penalty provision under section 186.22, subdivision (b)(5) for count 1.  The trial court is directed to modify the abstracts of judgment to reflect convictions by jury trial.  The orders imposing the criminal restitution fines (§ 1202.4, subd. (b)) are reversed.  On remand, the court shall hold a hearing on defendants' ability to pay the fines.  If either defendant demonstrates an inability to pay the fine, the court shall not impose the fine on that defendant.  If either defendant fails to demonstrate his inability to pay the fine, the court may impose it on that defendant.  After the trial court decides whether to impose the assessments, the clerk of the superior court is directed to prepare an amended abstract of judgment to reflect the correct sentence, presentence custody credits, and assessments,

18

if any.  The clerk of the superior court is also directed to issue an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

RAPHAEL
J.

We concur:

MCKINSTER
Acting P. J.

MILLER
J.