Filed 4/19/21  P. v. Reed CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL D. REED,<br><br>Defendant and Appellant. | A155280<br><br>(San Francisco City & County Superior Ct. No. 226661) |

THE COURT:

It is ordered that the opinion filed herein on March 30, 2021, be modified as follows:

1.      On page 5, the first full sentence of the first full paragraph beginning, "The following Tuesday, August 1, 2017, . . ." is changed to:

> The following Tuesday, August 1, 2017, after the jury had returned its phase 1 verdict, Juror No. 12 told the court's bailiff at a break about the vandalism episode at his home.

There is no change in judgment.

The petition for rehearing is denied. Presiding Justice Pollak and Justice Brown joined in the decision.  Justice Streeter would have granted the petition.

Date: _____          _____ P. J.

Filed 3/30/21  P. v. Reed CA1/4 (unmodified opinion)
See dissenting opinion

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MICHAEL D. REED,<br><br>    Defendant and Appellant. | A155280<br><br>(San Francisco City & County<br>Superior Ct. No. 226661) |

A jury found defendant Michael D. Reed guilty of possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1)), together with true findings on various sentencing enhancements.[1]  He received an aggregate sentence of seven years in prison, which included one year for a prior prison term.  On appeal, he argues (1) the trial court erred by failing to declare a mistrial on grounds of juror misconduct, (2) the one-year component of his sentence for a prior prison term must be stricken in light of the recent enactment of Senate Bill No. 136 (2019–2020 Reg. Sess.) (Stats. 2019, ch. 590, § 1), which he contends applies retroactively to nonfinal cases on appeal, and (3) the abstract of judgment erroneously states that he is entitled to 1376 days of custody credits, which he contends conflicts with the court's oral pronouncement of sentence awarding him 1378 days of custody credits.

---

[1] All further statutory references are to the Penal Code.

1

We reject defendant's first argument, but we agree that the one-year enhancement to his sentence must be stricken and that the abstract of judgment should be corrected to reflect the accurate number of custody credits. We shall therefore modify the judgment, but otherwise affirm.

## I. BACKGROUND

### A. *The Charges and Verdict*

One evening in 2016, Reed and a group of approximately 25 others attended a party at a residence on Turk Street in San Francisco. After drinking so much alcohol at the party that he became inebriated and staggered out of the house, Reed heard gunshots and was also startled by a bright flash that appeared to be gunfire coming from a car in the distance. This took place in a neighborhood where gunplay was common. Because Reed himself had been the victim of a shooting and had witnessed shootings multiple times, and because someone at the party had mentioned that a group of armed men was stirring up trouble nearby, Reed was fearful. So, he testified, he grabbed a "community gun" that was stashed on the top of a tire of a nearby parked car, and fired back in self-defense. Alerted to gun shots in the area by "shotspotter" sensors, police responded. Reed was eventually arrested after video surveillance footage identified him as a shooter. It turned out there were nine people in the car he saw, none of whom was hostile to Reed. One of them, in fact, was a good friend of his.

Reed was charged with nine counts of attempted first degree murder (§§ 664, 187, subd. (a); counts 1, 3, 5, 7, 9, 11, 13, 15, and 17), nine counts of assault with a semi-automatic firearm (§ 245, subd. (b); counts 2, 4, 6, 8, 10, 12, 14, 16, and 18), one count of possession of a firearm by a felon (§ 29800, subd. (a)(1); count 19), one count of discharge of a firearm at an occupied vehicle (§ 246; count 20), and one count of participating in a criminal street

gang (§ 186.22, subd. (a); count 21). The information further alleged that in the commission of counts 1 to 18 Reed personally discharged a firearm (§§ 12022.53, subd. (c), 12022.5, subd. (a)), and acted in association with a criminal street gang (§ 186.22, subd. (b)(1)); that he used a firearm in the commission of count 19 (§§ 667, subd. (e)(2)(C)(iii), 1170.12, subd. (c)(2)(C)(iii)), and that in the commission of count 20 he acted in association with a criminal street gang (§ 186.22, subd. (b)(4)(B)). Finally, the information alleged that Reed was on parole when he committed the offenses (§ 1203.085, subds. (a), (b)), and had been convicted of two prior strike offenses (§§ 667, subds. (d)–(e), 1170.12, subds. (b)–(c)) and two prior serious felonies (§ 667, subd. (a)(1)).

To minimize prejudice to Reed from evidence of his gang membership, gang activities, and prior convictions, the court conducted the trial in phases, starting in a first phase involving counts 1–20, the attempted murder, assault with a semi-automatic weapon, felon in possession of a weapon, and shooting at an occupied motor vehicle charges, along with accompanying enhancement allegations (except for the criminal street gang allegation pertaining to count 19); moving next to a phase 2 involving count 21 and all criminal street gang charges; and finishing in a third phase involving the prior conviction and prior prison term allegations. At the conclusion of the evidence in phase 1, the court granted a motion to dismiss the allegations that the attempted murders were willful, deliberate, and premeditated (as to counts 1, 3, 5, 7, 9, 11, 13, 15, and 17). The jury hung on the attempted murder and assault charges (counts 1 through 18), resulting in a mistrial on those charges, and returned verdicts of guilty on the felon in possession of a weapon and shooting at an occupied motor vehicle charges (counts 19 and 20). The court later recognized it was error not to have instructed the jury on

3

a lesser included charge to count 20, and granted a motion for a new trial on that ground.  In phase 2, the jury hung on the criminal street gang charge (count 21) and the related gang enhancement allegations.  And in phase 3, the jury returned true findings on the allegation that defendant was on parole at the time of the alleged offenses, and that defendant had suffered one prior conviction and served two prison terms.

## B.  Deliberations

The jury began its deliberations on the phase 1 charges at 9:43 a.m. on Wednesday, July 26, 2017.  They continued deliberating from 9:07 a.m. to 4:00 p.m. (with a 65-minute lunch break) on July 27.  The jury resumed its deliberations on Friday morning, July 28.  At 2:54 pm that day, the jury told the court it was unable to reach a verdict on any of the phase 1 counts.  The court informed the jury that further instructions would be read to them on Monday morning, July 31, and ordered them to return at 9:00 a.m. the following Monday for continued deliberations.

Before coming to court on Monday, July 31, Juror No. 12 discovered that someone had sprayed yellow or gold graffiti on the steps and walkway leading to the street in front of his house.  He interpreted the graffiti as gang-related, which was highly unusual for his neighborhood.  He did not take a photograph of the graffiti, which he did not recognize and could not read, and he did not speak to anyone at his home about the graffiti when he saw it that morning.  He did not mention the graffiti to anyone at the court when he arrived and proceeded to deliberate that day with his fellow jurors, nor did he inform anyone within the city government that the graffiti should be removed.  Only upon returning home from court on Monday evening did he discuss the graffiti with his husband, who had seen it by that point.

4

The following Tuesday, August 1, 2017, after the jury had returned its phase 1 verdict and counsel had presented opening argument at the start of phase 2, thus alerting Juror No. 12 for the first time to the prospect that there would be evidence of gang activity in the case, Juror No. 12 told the court's bailiff at a break about the vandalism episode at his home. The episode made him feel fearful, and he appeared to be upset when he disclosed this.

With counsel present, the court then conducted an inquiry outside the presence of the other jurors. In his testimony, Juror No. 12 explained that he did not mention the spray-painting in front of his house on Monday, July 31—the day he saw it—because it appeared to him that the jury was about to hang on counts 1–18, which he thought would conclude the trial. He stated he suspected the case might be gang-related because he had grown up in Chicago and was aware of gangs; the court responded that the jury questionnaire had also raised the issue of gangs, which Juror No. 12 confirmed. Juror No. 12 explained that "right at the beginning of deliberations," he mentioned to the other jurors his suspicion that the case could be in some way gang-connected. Because there was no gang-related evidence in the case at that point, however, none of the other jurors was interested in further discussing the issue "because they felt it was unsubstantiated." Juror No. 12 said he thereafter "dropped that line of thought because, as a group, [the jury] did not want to pursue" it. Then, having learned at the start of phase 2 the following Tuesday, August 1, that there may be a gang component to the case—which Juror No. 12 described as "all new news"—he "no longer felt [he] could be fair as related to" the phase 2 charges. The court inquired about possible bias before phase 2 began, and Juror No. 12 stated that the vandalism episode had not affected his fairness

5

and impartiality in the phase 1 deliberations. In response to a question from defense counsel, Juror No. 12 also made clear that he did not "bring up the topic of gang or gangs at all in any of [the] deliberations on Monday" after he saw the graffiti. At the conclusion of this inquiry, the court excused Juror No. 12 and replaced him with an alternate. Reed made no motion for a mistrial on the phase 1 verdict.

## II. DISCUSSION

### A. *Phase 1 Verdict*

#### 1. Governing Legal Principles

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' " 'capable and willing to decide the case solely on the evidence before it.' " ' " (*In re Hamilton* (1999) 20 Cal.4th 273, 293–294.) "A sitting juror's involuntary exposure to events outside the trial evidence, even if not 'misconduct' in the pejorative sense, may require . . . examination for probable prejudice. Such situations may include attempts by nonjurors to tamper with the jury, as by bribery or intimidation." (*Id.* at pp. 294–295.) "Misconduct by a juror, or a nonjuror's tampering contact or communication with a sitting juror, usually raises a rebuttable 'presumption' of prejudice." (*Id.* at p. 295.) A juror is permitted to testify to " 'any facts bearing upon the question of the existence of the disturbing influence,' " but may not testify whether and to what extent the influence operated upon the juror's mind. (*People v. Holloway* (1990) 50 Cal.3d 1098, 1109; Evid. Code, § 1150.)

"[W]hether an individual verdict must be overturned for jury misconduct or irregularity ' " 'is resolved by reference to the substantial likelihood test, an objective standard.' " ' [Citation.] Any presumption of

6

prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant." (*In re Hamilton, supra,* 20 Cal.4th at p. 296.)

The Supreme Court has recognized that some extraneous material, judged objectively, is so prejudicial in context as to be "inherently and substantially likely to have influenced the juror." (*In re Carpenter* (1995) 9 Cal.4th 634, 653.) A court can also find bias, even if the information is not "inherently prejudicial" where, from the nature of the misconduct and the surrounding circumstances, the court determines that it is substantially likely a juror was "actually biased." (*People v. Nesler* (1997) 16 Cal.4th 561, 579.) On a record disclosing that there is a substantial likelihood a juror was actually biased, failure to set aside a verdict on which the juror voted compels reversal. "[N]o matter how convinced we might be that an unbiased jury would have reached the same verdict, . . . a biased adjudicator is one of the few structural trial defects that compel reversal without application of a harmless error standard." (*Ibid.*)

## 2. Analysis

Juror No. 12 discovered on July 31, the fourth day of phase 1 deliberations, that his home had been vandalized in an incident he felt was gang-related. He mentioned this incident to no one in court on that date, first reporting it to the court the next day when he learned that the case would involve gang-related evidence. During the court's inquiry into the issue on August 1, Juror No. 12 testified he could no longer be impartial, given the "all new news" that phase 2 would involve gang-related issues.

As a preliminary matter, defendant concedes that his trial counsel failed to move for a mistrial or to set aside the phase 1 verdict based on Juror No. 12's disclosure of the graffiti outside his home.[2] His claim of error is therefore waived. (*People v. Stanley* (2006) 39 Cal.4th 913, 950 [after learning that a juror had read a newspaper article about the trial, defendant failed to object to the juror's continued service and failed to request a mistrial; "[a]s such, the claim is waived on appeal"]; *People v. Russell* (2010) 50 Cal.4th 1228, 1250 (["Defense counsel did not object to Juror No. 8's continued service on the jury, and did not request a mistrial based upon juror misconduct. A claim of prejudicial misconduct is waived when the defendant fails to object to a juror's continued service and fails to seek a mistrial based upon prejudice"].)[3]

Even if we were inclined to exercise our discretion to address this claim, we would find no basis for reversal. On this record, the illegible graffiti was not inherently prejudicial, and any presumption of prejudice arising from Juror No. 12's viewing of the graffiti was rebutted, as there is

---

[2] We note that defense counsel seems to have made a conscious tactical decision not to move to set aside the phase one verdict (which ultimately resulted in a conviction as to only count 19) on the basis of Juror No. 12's viewing of the graffiti. Defense counsel made no such request at the time of Juror No. 12's statements to the court and counsel, nor did defense counsel raise any issue as to Juror No. 12 in her motion for a new trial.

[3] Although Reed cites *People v. Vera* (1997) 15 Cal.4th 269, 276 for the proposition that " 'a defendant is not precluded from raising for the first time on appeal a claim asserting the deprivation of certain fundamental, constitutional rights,' " he fails to recognize that *Vera* predated the Supreme Court's subsequent decisions in *Stanley* and *Russell*. Moreover, the Supreme Court subsequently called this statement from *Vera* "dictum," noting that it was "not intended to provide defendants with an 'end run' around the forfeiture rule, thus eviscerating it." (*People v. Tully* (2012) 54 Cal.4th 952, 980, fn. 9.)

"no substantial likelihood that one or more jurors were actually biased against the defendant." (*In re Hamilton, supra,* 20 Cal.4th at p. 296, italics omitted.) Juror No. 12 did not raise the graffiti with his fellow jurors or anyone at the court on the day he saw it, the fourth day of deliberations on the phase 1 charges, which did not involve any gang-related allegations or evidence. These facts strongly suggest that the graffiti did not cause Juror No. 12 to be biased during the phase 1 deliberations, especially given that he had previously suspected and briefly raised with his fellow jurors the possibility that the case was gang-related "right at the beginning of deliberations." If viewing the graffiti on Monday morning, July 31, had caused Juror No. 12 to harbor gang-related bias toward Reed during consideration of the phase 1 charges, one would expect him to have raised the incident or the issue of gangs again that day. He made clear, however, that he did not "bring up the topic of gang or gangs at all in any of [the jury's] deliberations on Monday."

Second, the court's observation of and colloquy with Juror No. 12 on August 1 further supports the inference that Juror No. 12 was not biased during the phase 1 deliberations, and only began to feel partial after learning on August 1 the "all new news" that the case would, in fact, involve gang evidence. The court observed that Juror No. 12 appeared shaken and distraught when speaking with the court and counsel about the graffiti. After confirming that Juror No. 12 had not shared the information about the graffiti with the other jurors on July 31, the court summarized her understanding of what Juror No. 12 stated on August 1: "[G]iven the graffiti in front of your house and given that there are gang allegations *in this case now*, you could *no longer be unbiased.* And you seemed to imply that you *no longer felt you could be fair as related to these charges* to Mr. Reed." Juror

9

No. 12 confirmed the court's summary. Again, if Juror No. 12 had felt distraught and biased when deliberating on the day he saw the graffiti, one would expect him to have corrected the trial court and said that his bias had arisen earlier, and one would expect that someone in the courthouse would have noticed his distress before August 1. Similarly, if Juror No. 12 had felt distraught and shaken on the morning he saw the graffiti, one would have expected him to photograph it or at least mention it to his husband before that evening.

Third, on the afternoon of July 28—three days before Juror No. 12 saw the graffiti—the jury informed the court that it believed itself to be deadlocked on the phase 1 counts. The court ordered the jury to continue deliberating the following Monday, and the jury ultimately returned guilty verdicts on only counts 19 and 20, which were the felon in possession of a firearm and shooting at an occupied motor vehicle charges.[4] As the factual basis for those two charges was supplied by a stipulation as to defendant's status as a felon, his testimony that he grabbed a gun and began shooting, and the forensic evidence showing multiple shell casings next to a black SUV, the jury's July 28 note and the July 31 verdict itself rebut any presumption that Juror No. 12's viewing of the graffiti caused gang-related bias toward defendant.

Accordingly, defendant's argument as to alleged juror misconduct provides no basis for reversal.

---

[4] As noted previously, the trial court ultimately granted the defense's motion for a new trial as to count 20, the shooting at an occupied motor vehicle charge.

## B. *Senate Bill No. 136*

The trial court sentenced defendant to the upper term on count 19 (the felon in possession of a firearm charge), doubled for a strike prior, plus a one-year enhancement pursuant to section 667.5, subdivision (b) for a prior conviction. When defendant was sentenced, "section 667.5, subdivision (b) required trial courts to impose a one-year sentence enhancement for each true finding on an allegation the defendant had served a separate prior prison term and had not remained free of custody for at least five years. (§ 667.5, subd. (b).) Courts nevertheless had discretion to strike that enhancement pursuant to section 1385, subdivision (a). [Citation.] Effective as of January 1, 2020, Senate Bill 136 amend[ed] section 667.5, subdivision (b) to limit its prior prison term enhancement to only prior prison terms for sexually violent offenses, as defined in Welfare and Institutions Code section 6600, subdivision (b)." (*People v. Jennings* (2019) 42 Cal.App.5th 664, 681.) The conviction underlying Reed's prior prison term enhancement was for a violation of section 245, subdivision (b), which is not listed in Welfare and Institutions Code section 6600, subdivision (b). (Welf. & Inst. Code, § 6600, subd. (b).)

Because Senate Bill No. 136 (2019–2020 Reg. Sess.) reduced a criminal punishment, "[i]t is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply." (*In re Estrada* (1965) 63 Cal.2d 740, 745; *People v. Buycks* (2018) 5 Cal.5th 857, 882 [" 'The rule in *Estrada* has been applied to statutes governing penalty enhancements, as well as to statutes governing substantive offenses' "].) "This intent seems obvious, because to hold otherwise would be to conclude that the Legislature was motivated by a

11

desire for vengeance, a conclusion not permitted in view of modern theories of penology." (*Estrada*, at p. 745.) Accordingly, as the People here concede, Senate Bill No. 136 applies retroactively to defendants like Reed, whose case was not yet final when the statute took effect on January 1, 2020. (*People v. Cruz* (2020) 46 Cal.App.5th 715, 738–739.) The one-year enhancement must therefore be stricken from defendant's sentence.

### C. Custody Credits

The People also concede that the abstract of judgment, which states that defendant had a total of 1376 custody credits, should be corrected to reflect 1378 custody credits as of the date of sentencing, consistent with the trial court's oral pronouncement that the defendant had served 689 days in custody and was entitled to 689 custody credits. We accept the concession. (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385 ["Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls"].)

## DISPOSITION

The judgment is modified by correcting the credits calculation to reflect 1378 custody credits and by striking the one-year enhancement pursuant to Senate Bill No. 136 (2019–2020 Reg. Sess.) and section 667.5, subdivision (b), as amended. The trial court is ordered to amend the abstract of judgment in accordance with this opinion, and to forward a certified copy of the amended judgment to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

BROWN, J.

I CONCUR:

POLLAK, P. J.

*People v. Reed* (A155280)

12

STREETER, J., Dissenting.

I respectfully dissent from the majority's holding that the trial court did not err in failing to set aside the Phase I verdict.  Juror No. 12 admitted believing the graffiti incident at his home was gang-related, admitted raising the issue of gang motivation with fellow jurors in Phase I deliberations (which shows *he* thought there was a gang issue in the case at that stage), and admitted actual bias a few days after the jury rendered its Phase I verdict, which resulted in his excusal for cause.  On these facts I cannot agree that Juror No. 12's admitted bias suddenly appeared when the prosecution made clear what he suspected all along—that there was a gang issue in the case.  For him to participate in the Phase I deliberations and cast a vote on the verdict was wrong.  Because the right to a fair and impartial jury is not subject to waiver or forfeiture, and because the presence of even a single biased juror on a jury violates that right, resulting in structural error that is prejudicial per se, I would reverse on grounds of juror misconduct.

STREETER, J.